

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-10-1998

# Wilburn v. Maritrans GP Inc

Precedential or Non-Precedential:

Docket 97-1012

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Wilburn v. Maritrans GP Inc" (1998). *1998 Decisions.* Paper 42.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/42

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 10, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1012

MICHAEL T. WILBURN,
        Appellant

v.

MARITRANS GP INC.
        Appellee

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 95-cv-2806)

Argued October 23, 1997

BEFORE: MANSMANN, GREENBERG AND ALARCON1 ,
Circuit Judges

(Filed: March 10, 1998)

_____

1. Honorable Arthur L. Alarcon, United States Senior Circuit Judge for
the Ninth Circuit, sitting by designation.

Leonard C. Jaques
Donald A. Krispin
Michael J. Connor (argued)
Cynthia J. Sherburn
Jaques Admiralty Law Firm
1370 Penobscot Building
Detroit, MI 48226

 Attorneys for Appellant

Stuart M. Goldstein (argued)
Hollstein, Keating, Cattell
Johnson & Goldstein
1030 Laurel Oak Road, Ste. 2
Voorhees, NJ 08043

 Attorney for Appellee

OPINION OF THE COURT

ALARCON, Circuit Judge.

Michael T. Wilburn ("Wilburn") was injured when he was swept off the deck of the tug, the Enterprise, by a huge wave during a storm. He filed an action against his employer, Maritrans GP Inc. ("Maritrans") to recover damages for negligence pursuant to the Jones Act, 46 U.S.C. S 688, and for the unseaworthiness of the Enterprise under general maritime law.

At trial Wilburn did not present any expert testimony in support of his theories of liability. The jury found that Maritrans was negligent and that the Enterprise was unseaworthy. The district court granted Maritrans's motions for judgment as a matter of law and for a new trial on the basis that the evidence was insufficient because Wilburn failed to present expert testimony. The court ruled that the facts and circumstances of the case were beyond the common knowledge and experience of the jurors. The court also found that the evidence was insufficient to support the jury's award of damages.

2

We conclude that an expert's testimony was not required to support the jury's finding of liability as to one of Wilburn's theories of negligence. The failure to require the jury to return special verdicts, however, precludes us from determining which theory or theories of negligence and unseaworthiness were adopted by the jury. We also hold that the district court erred in excluding lay opinion testimony. Accordingly, we reverse the judgment as a matter of law and we affirm the district court's order granting a new trial as to liability. Regarding damages, we hold that the evidence was sufficient to show a narrowing of Wilburn's economic opportunities, however, it was insufficient to support the jury's award of damages. We therefore reverse the district court's judgment as a matter of law and affirm the order granting a new trial with respect to damages.

I

ISSUES ON APPEAL

Wilburn seeks reversal of the district court's orders on the following grounds:

One. The district court abused its discretion in precluding lay witnesses from presenting opinion testimony based on facts within their personal knowledge.

Two. The district erred as a matter of law in ruling that expert testimony was required because a rational jury could not comprehend the primary facts and draw a correct conclusion regarding whether the captain of the Enterprise acted negligently and whether the Enterprise was seaworthy.

Three. The district court erred in concluding that the evidence was insufficient to support the jury's award of two million dollars in damages.

We discuss each contention and the facts pertinent thereto under separate headings.

II

LIABILITY

A. Judgment as a Matter of Law

During trial, Wilburn's counsel requested the court's permission to introduce the lay opinion of Charles Stanley, the barge captain, and Wilburn regarding the cause of Wilburn's injuries based on their experience working on tugs and barges. Maritrans's counsel objected on the ground that Wilburn and Stanley had not been listed or identified as experts as required by Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure. Defense counsel argued that Stanley and Wilburn's opinion testimony was precluded by the court's April 18, 1996 pretrial order. The order reads as follows:

> IT IS HEREBY ORDERED that plaintiff is precluded from offering at the time of trial of this matter, any expert opinions and other expert evidence which have not been provided to defendant by March 15, 1996.

The order was issued in response to Maritrans's motion to compel discovery filed on November 20, 1995 and its January 23, 1996 motion in limine for an order precluding Wilburn from offering any expert opinions or other expert evidence.

The district court sustained Maritrans's objection to the introduction of the opinions of Wilburn's lay witnesses because they had not been listed as experts in response to the district court's pre-trial order. In so ruling, the district court appears to have concluded that Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure compels disclosure of the fact that an identified lay witness will also testify regarding his or her opinion concerning a fact in issue. To the extent that the district court's exclusion of the opinions of lay witnesses was based on an interpretation of Rule 26(a)(2)(A), our review is plenary. See International Union, UAW v. Mack Trucks, Inc., 917 F.2d 107, 110 (3d Cir. 1990). We must also decide whether the district court's ruling was consistent with Rule 701 of the Federal Rules of

4

Evidence. We review independently a district court's interpretation of Rule 701. See Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1194 (3d Cir. 1995); U.S. v. Furst, 886 F.2d 558, 571 (3d Cir. 1989).

Pursuant to Rule 26(a), a party must disclose certain evidence to the other parties in the action without awaiting a discovery request. A party is expressly required to disclose "the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." Fed. R. Civ. P. 26(a)(2)(A). "If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." Fed. R. Civ. P. 37(a)(2)(A).

Rule 702 of the Federal Rules of Evidence provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. Wilburn and Stanley were not called by the plaintiff to testify as expert witnesses. Wilburn's counsel informed the district court that as lay witnesses "[t]hey will render opinion evidence about this situation, but they are not experts. They have not been retained as such nor are they specially in this case, because they give expert testimony."

Rule 701 of the Federal Rules of Evidence permits a lay witness to provide opinion evidence. Rule 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Fed. R. Evid. 701.

Rule 701 permits evidence that is considered " `shorthand renditions' of a total situation, or . . . statements of

5

collective facts." Asplundh at 1196 (internal quotation marks and citations omitted). These are situations where "the differences between fact and opinion blur and it is difficult or cumbersome for the examiner to elicit an answer from the witness that will not be expressed in the form of an opinion." Id. at 1198.

There is, however, a trend towards an even more liberal construction of Rule 701. "[Rule 701] jurisprudence has expanded beyond this core area to permit lay persons to express opinions that are not shorthand statements of fact, so long as the personal knowledge, rational basis, and helpfulness standards of Rule 701 are met." Id. The rational basis prong requires that the witnesses' opinion be "grounded in either experience or specialized knowledge." Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1198 (3d Cir. 1995).

Today, "[a] lay witness with first hand knowledge can offer an opinion akin to expert testimony in most cases, so long as the trial judge determines that the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion." Id. at 1201-02. "The essential difference between [Rule 701 and 702 testimony] . . . is that a qualified expert may answer hypothetical questions." Teen-Ed, Inc. v. Kimball Int'l Inc., 620 F.2d 399, 404 (3d Cir. 1980). Moreover, Rule 704 of the Federal Rules of Evidence authorizes the admission of the opinion of lay witnesses regarding the ultimate issues to be decided by the trier of fact. Fed. R. Evid. 704.

Rule 26(a)(2) of the Federal Rules of Civil Procedure does not require a party to provide the name of any person who may be used at trial to present evidence under Rule 701. Because disclosure of a lay witness's opinion testimony is not required by Rule 26(a)(2)(A), the district court lacked the power to sanction Wilburn solely because he failed to disclose the fact that he and Stanley would be testifying regarding their opinions as to a fact in issue.

This court confronted a similar situation in Teen-Ed, Inc. v. Kimball Int'l Inc., 620 F.2d 399 (3d Cir. 1980). In Teen-Ed, the district court rejected a lay witness's opinion testimony because the appellant failed to identify him

6

before trial as an expert witness. See id. at 404. This court noted that the district court "failed to distinguish between opinion testimony which may be introduced by lay witnesses and that which requires experts." Id. at 403. In reversing the district court's ruling, this court held as follows: "We interpret the pre-trial ruling in this case to have required identification of expert witnesses under Rules 702 and 703, but not of lay witnesses under Rule 701." Id. at 404.

The district court also erred in failing to determine whether Wilburn and Stanley, as percipient witnesses to the events that occurred before Wilburn was tossed from the deck of the Enterprise by a gigantic wave, possessed the requisite knowledge or experience to provide opinion testimony.

The district court's error in excluding the opinions of lay witnesses prevented Wilburn from presenting evidence in support of his theories that the negligence of an employee of Maritrans and the unseaworthiness of the Enterprise were the direct cause of his injuries. A defendant is not entitled to a judgment as a matter of law on the basis that the evidence is insufficient if the trial court has erroneously excluded relevant and admissible evidence. See Scott v. Plante, 641 F.2d 117, 136 (3d Cir. 1981), vacated on other grounds, 458 U.S. 1101 (1982). Accordingly, we must reverse the judgment as a matter of law, entered pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, regarding Maritrans's liability for negligence and unseaworthiness.

B. Motion for a New Trial

Our reversal of the order granting judgment as a matter of law requires us to consider the district court's conditional grant of a new trial pursuant to Rule 50(c)(1). Wilburn contends that the district court erred in concluding as a matter of law that the evidence regarding liability was insufficient because of his failure to present a maritime expert to prove negligence and unseaworthiness. Wilburn disputes the district court's finding that "the facts and circumstances presented in this case were beyond the

7

realm of knowledge and experience of the jurors." This court exercises plenary review when the grant of a motion for new trial is based on the application of a legal precept. See Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095 (3d Cir. 1995).

"The duty of the vessel owner to furnish a reasonably safe place for a seaman . . . to perform his chores is clearly a duty of care, the breach of which results in liability for negligence . . . ." Earles v. Union Barge Line Corp., 486 F.2d 1097, 1104 (3d Cir. 1973). Under the Jones Act, an employer is liable for injury suffered by a seaman through the negligence of the employer or a fellow employee. See Barnes v. Andover Co., L.P., 900 F.2d 630, 634 (3d Cir. 1990) (citing De Zon v. American President Lines, 318 U.S. 660–65 (1943)). As the district court instructed the jury, "negligence requires the defendant to guard against those risks or dangers of which it knew, or by the exercise of due care, should have known. . . . [T]he defendant's duty is measured by what a reasonably prudent person would anticipate or foresee resulting from particular circumstances." The standard of proof for causation is relaxed in cases filed pursuant to the Jones Act. Causation is satisfied if "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury . . . ." Rogers v. Missouri Pacific R.R. Co., 352 U.S. 500, 506 (1957).

The evidence established the following facts concerning the events that occurred aboard the Enterprise on November 9, 1992. On that date, Wilburn was employed as an able-bodied tankerman ("AB tankerman") on the Enterprise. The Enterprise was en route from Corpus Christi, Texas to New York. It was pushing the Ocean 262, a 590 foot barge. The barge was loaded with crude oil.

Pushing is the most efficient method of transporting cargo in a tug-barge configuration in fair weather. In that setup, the bow of the tug is inserted in a deep, v-shaped notch in the stern of the barge. Lines are used to secure the tug's bow to the barge's stern. In stormy weather, the tug-barge configuration must be changed so that the tug pulls the barge using a hawser cable.

The weather was uneventful on the morning and afternoon of November 9, 1992 as the Enterprise pushed the barge north along the coast of Florida. Weather conditions began to deteriorate steadily in the early evening hours. By 6:00 p.m., the wind had reached twenty-five to thirty miles per hour, and the waves were eight to ten feet high.

At approximately 9:00 p.m., Norval Hearn, the captain of the Enterprise, contacted the National Weather Service because it was evident that weather conditions were worsening. Up until that point, he had been receiving reports indicating that weather conditions would improve. For that reason, he did not decide to get out of the notch earlier. Captain Hearn was informed that the Enterprise was in the worst possible place it could be in relation to the storm. At that time, the Enterprise was approximately seventeen and one-half miles off the Florida coast. Captain Hearn was advised to leave the area as soon as possible.

After receiving this report, Captain Hearn conferred with Herb Potter, the chief engineer. Potter informed Captain Hearn that there was no other choice except to get out of the notch and switch to a pulling configuration to avoid tearing up the tug and the barge. The wind was blowing in one direction and the waves were coming from the opposite direction. These forces caused the Enterprise to move back out of the notch and then slam into the barge because the two vessels were connected together by the Samson line. The wave action was also causing the tug's fendering system to ride on top of the combing of the barge. If the tug twisted in the notch under such circumstances, it could tear out the side of the Enterprise and cause it to sink. Potter also testified that while he and Captain Hearn were discussing exiting the notch, Captain Hearn attempted to change course in an effort to minimize the impact of the wave action. In every position he attempted, however, the conditions got worse.

Captain Hearn testified that he considered going into port or one of the nearby inlets off the coast. He was concerned, however, that the easterly weather was causing the seas to build up close to shore and the tides would be rising, making the vessels hard to control and navigation unsafe

9

through the inlets. He also considered going closer to shore, but was concerned that the tug would run aground because of its thirty-six foot six inch draft. At the time of the incident, the Enterprise was seventeen to twenty miles off-shore, and the ocean was approximately 876 feet deep at that distance from shore. Captain Hearn testified that even though running aground was not an immediate problem, he didn't think the weather conditions would be any better closer to shore. Although the weather reports indicated that conditions at shore might be milder, he didn't trust the reports because they didn't reflect the extremely bad weather that the tug was experiencing. Maritrans's weather expert also testified that the reports received by the Enterprise did not reflect the weather that the tugboat was experiencing, but did accurately reflect the weather at shore.

Captain Hearn also testified that dropping anchor and waiting out the storm was not a feasible option. Because of the depth of the ocean, he did not think they had enough anchor chain. Moreover, the anchor was located on the bow of the barge and waves were breaking over the bow; it would have been unsafe to send someone to drop anchor under those conditions.

Notwithstanding the fact that Captain Hearn had concluded at approximately 9:00 p.m. that the current storm conditions compelled switching the Enterprise from the pushing setup to a towing configuration, he stayed the course and the Enterprise continued to push northward in the notch position until 10:40 p.m.. By then, the wind velocity was forty to fifty miles per hour. The waves had increased in height to eighteen to twenty-two feet. At that time, Captain Hearn ordered the crew to back the Enterprise out of the notch. To carry out this maneuver, it was necessary to release the Samson line connecting the tug to the barge. Disconnecting the Samson line can be accomplished in three ways: It can be released from the bow of the tug in which case the Samson line will trail harmlessly behind the barge until it is hauled aboard. It can be released from the stern of the barge and left connected to the tug. Because the Samson line can get caught in the tug's propellers, however, it must be hauled

10

aboard the tug by members of the crew using a capstan. The line can also be released from both vessels and left in the water; although, this also creates a risk that it will get caught in the tug's propellers.

Captain Hearn testified that the most prudent choice during severe storm conditions would be to release the Samson line from the bow of the tug so that it would trail behind the barge. This choice would permit the crew to seek refuge below deck.

There is a conflict in the evidence regarding whether Captain Hearn ordered the Samson line disconnected from the tug or the barge. Captain Hearn testified that he ordered it disconnected from the bow of the tug. Charles Stanley, the barge captain, testified that Captain Hearn ordered him to disconnect the Samson line from the stern of the barge. After members of the crew on board the Enterprise slacked the Samson line, Stanley disconnected the line and threw it off the barge. Stanley testified that Captain Hearn directed him to let the Samson line go. According to Stanley, Captain Hearn stated: "Lose the line." Stanley testified that this command meant: "Let it go in the water. We don't need it; Don't waste any time trying to collect it." Stanley stated that Captain Hearn changed his mind, however, and ordered him to "[s]ave the line if you can." Stanley ordered Bill Shelley, a crew member, to turn on the capstan located on the bow of the Enterprise in order to retrieve the Samson line.

Captain Hearn testified that he did not order Stanley to "lose the line," or detach it from the Enterprise after it had been released from the barge. Rather, he ordered the Samson line hauled on board the tug after Stanley failed to disconnect it in accordance with his instructions. Captain Hearn issued this order because he was afraid the Samson line would get caught in the tug's propellers.

Wilburn and other crew members proceeded to assist in hauling the Samson line aboard the Enterprise. While the Samson line was being reeled in, the Enterprise went over a huge wave and then plunged down into another wave. A wall of water crashed down on the bow of the Enterprise, lifted Wilburn up, and carried him thirty feet beyond the side of the tug.

11

After Wilburn went overboard, Captain Hearn called the United States Coast Guard and informed them that they had a man overboard. As the tug swung back around to find Wilburn, the crew focused a spotlight on him. After several attempts to throw Wilburn a life ring, the crew finally succeeded. A crew member informed Wilburn that a helicopter would be there in five minutes. The crew was unaware, however, that the Coast Guard could not send a cutter to Wilburn because of the heavy seas. Believing he would only have to wait a short time, Wilburn decided not to board the tug because he was concerned that he might be slammed against the hull. In order to avoid that risk to Wilburn, the crew added another piece of line to the life line so that Wilburn could swim farther away from the Enterprise. Despite the extra line, Wilburn was pulled underwater as the tug reacted to the eighteen to twenty-two foot waves. The crew was forced to let the line go. Wilburn began to drift away from the tug to a point where the spotlight could no longer focus on him. Finally, after being in the water for two hours, a Coast Guard helicopter rescued Wilburn and transported him to a hospital.

Maritrans urges us to affirm the district court's determination that expert testimony was required in this matter because

> the incident involves complex, technical, and specialized areas of the maritime experience and practice, knowledge of vessel characteristics and functions, ocean-going navigation, vessel handling, sea going operations and procedures, and safety at sea, all areas about which a jury must have guidance before it can make a determination.

Appellee's Br. at 27.

The Supreme Court has instructed that

> expert testimony not only is unnecessary but indeed may be properly excluded in the discretion of the trial judge "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses pos-

12

> sessed of special or peculiar training, experience, or
> observation in respect to the subject under
> investigation . . . ."

Salem v. United States Lines Co., 370 U.S. 31, 35 (1962)
(quoting United States Smelting Co. v. Parry, 166 F. 407.
415 (8th Cir. 1909)). We must decide whether persons of
common understanding could comprehend the primary
facts offered by Wilburn to demonstrate the cause of his
injuries.

One of the negligence theories presented to the jury was
whether a reasonable person would anticipate or foresee
that disconnecting the Samson line from the barge and
creating the need for the crew to be on the deck to retrieve
it under the prevailing extreme weather and sea conditions
could produce an injury to the plaintiff. The jury received
photographs that permitted it to visualize the bow of the
Enterprise in the notch. The severe nature of the storm and
the immensity of the eighteen to twenty-two feet waves were
vividly described by Captain Hearn and other members of
the crew. The jury also heard Captain Hearn's testimony
that releasing the Samson line from the Enterprise was the
safest procedure under the extraordinary circumstances
they were confronting in order to keep the crew safely off
the deck.

The district court relied on three cases in support of its
conclusion that expert testimony was required regarding
each of Wilburn's negligence theories. In Smith v. United
Gas Pipeline Co., 857 F.2d 1471 (5th Cir. 1988)
(unpublished table opinion), an unpublished opinion
discussed in Peters v. Five Star Marine Service, 898 F.2d
448 (5th Cir. 1990), the trial judge refused to allow a
maritime operations expert to testify as to the
reasonableness of a ship-to-ship transfer of machinery dur-
ing rough seas. Without the guidance of an expert, the jury
was asked to gauge the reasonableness of using a ship's
crane equipped with a "headache ball" and a shackle
without a "tag line" while the two ships were stern-to-stern
in heavy seas. See id. at 450. The Fifth Circuit held in
Smith that "[t]he trial judge abused his discretion in
deciding that an analysis of the confluences of these factors

13

was within the realm of the average juror's knowledge and experience." Id.

In Peters, the court distinguished Smith by holding that a jury could determine from its common knowledge and experience "whether it was reasonable for an employer to instruct his employee to manually move equipment on the deck of a boat during heavy seas." Id. We agree with the court's reasoning in Peters, and the distinction it drew between the factual question presented in that matter as opposed to the complex and technical engineering question that faced the jury in Smith.

In Martin v. United Fruit Co., 272 F.2d 347 (2d Cir. 1959), the Second Circuit upheld the trial court's decision to exclude from the jury's consideration the question whether the placement of a hinge at the bottom of a deadlight was an improper method of ship construction. See id. at 349. The court held that "expert knowledge of nautical architecture is required in order to form an intelligent judgment." Id.

In Fatovic v. Nederlandsch-Ameridaansche Stoomvaart, Maatschappij, 275 F.2d 188 (2d Cir. 1960), the Second Circuit held that the district court erred in submitting to the jury the plaintiff's theory that the vessel was unseaworthy because of the absence of a stopping arrangement that could have feasibly been constructed to prevent a boom from swinging against the kingpost causing the plaintiff's injury. The court held that the plaintiff had failed to present any evidence to support this theory. See id. at 190. In dictum, the court observed that "[i]n any event, the question was one of nautical architecture about which jurors lack the knowledge to form an intelligent judgment in the absence of expert testimony." Id. (citing Martin v. United Fruit Co., 272 F.2d 347 (2nd Cir. 1959)). Unlike Martin and Fatovic, in the matter sub judice, no question of the construction of either vessel was at issue.

The jury did not require expert testimony in order to understand that the only reason Wilburn was on the deck of the tug, and consequently in a position where he could get washed overboard by a wave, was because he was ordered to haul the Samson line on board the tug during a

14

violent storm that was producing enormous waves, which caused the ship to roll and pitch. It was also easily comprehendible to a person of common understanding that if the Samson line had been disconnected from the Enterprise rather than the barge, there would have been no need to haul the Samson line on board the tug. The jury could have found that Maritrans was liable for negligence because the Samson line was not released in a manner that was reasonably prudent under the exigent circumstances confronting the persons aboard the Enterprise.

Because Maritrans was responsible for the acts of all its employees, see Barnes v. Andover Co., L.P., 900 F.2d 630, 634 (3d Cir. 1990) (citing De Zon v. American President Lines, 318 U.S. 660-65 (1943)), the evidence was sufficient to demonstrate to the jury that Maritrans was liable without the aid of expert testimony whether Captain Hearn directed the release of the Samson line from the barge or whether, instead, Stanley did so in violation of Captain Hearn's order.

Having determined that the district court erred in concluding that the evidence was insufficient to demonstrate negligence on any of the theories asserted by Wilburn in the absence of expert testimony, we must now consider whether the district court's order granting Maritrans a new trial may stand notwithstanding the district court's erroneous ruling. We may affirm a district court's judgment if the result it reached is correct although we disagree with its reasoning. See PAAC v. Rizzo, 502 F.2d 306, 308 & n.1 (3d Cir. 1974).

Wilburn argued to the jury that Captain Hearn committed several negligent acts each of which caused his injuries. The acts were as follows: 1) the inabili ty to maneuver the vessels out of the effects of the storm; 2) the captain's decision to heed the initial weather forecasts and not leave the notch earlier; 3) the decision not t o take the vessels in-shore or to port; 4) the decision not t o drop anchor; 5) the manner of releasing the Samson line ; 6) the decision not to remain in the notch after the lines were removed; and 7) the failure to anticipate a large wave.

Unfortunately, the jury was not presented with special verdict forms concerning Wilburn's discrete theories of

15

negligent conduct. As a result, we cannot determine from the record whether the jury found that Captain Hearn was negligent in ordering the Samson line released from the barge, or whether the verdict was based on a finding that he acted negligently in the performance of one of the other alleged negligent acts.

We are persuaded that the question whether Captain Hearn was negligent in failing to change course and maneuver the vessels shoreward or in his decision not to leave the notch earlier was beyond the common knowledge possessed by the members of the jury. These decisions require a knowledge of the navigation and operation of an ocean going tug and barge in bad weather. Where a jury has returned a general verdict and one theory of liability is not sustained by the evidence or legally sound, the verdict cannot stand because the court cannot determine whether the jury based its verdict on an improper ground. See Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1229 (10th Cir. 1996); Nowell v. Universal Elec. Co., 792 F.2d 1310, 1312 (5th Cir. 1986). Although we have determined that expert testimony was not required to support Wilburn's theory that Maritrans was liable for negligence because the Samson line was released from the barge, the verdict cannot stand because we conclude that the question whether any of Captain Hearn's navigational decisions were negligent was outside the common knowledge of the jury.

We do not reach the question whether Wilburn and Stanley possess the requisite knowledge and experience to present their lay opinions on the navigation of a tug and barge during a storm to guide the jury in reaching a proper verdict, or whether expert testimony is required for this purpose.

The jury also found that the Enterprise was unseaworthy. Wilburn alleged four theories of unseaworthiness: one, there was no company policy or procedures for dealing with rough weather; two, the tug failed to have enough life line on board to aid Wilburn once he went overboard; three, the Samson line fouled on itself as it was being hauled onto the capstan; and four, the captain and his officers were not reasonably adequate to perform their assigned tasks of navigating the tug out of the storm area or adapting to the

weather situation in a timely manner. We conclude that the question whether the captain and crew were reasonably able to perform their assigned duties was outside the common understanding of the jury. The use of a general verdict negates the need to determine whether any of the other theories of unseaworthiness could be proved without expert testimony because we cannot discern from this record which theory the jury adopted.

III

SUFFICIENCY OF THE EVIDENCE TO SUPPORT
THE AWARD OF DAMAGES

A. Judgment as a Matter of Law

In setting forth its reasons for granting the judgment as a matter of law, the district court separately concluded that the evidence was insufficient to support an award of damages for loss of future earning capacity. The district court explained its ruling as follows:

> Wilburn produced no evidence regarding what, if any, positions as barge captain were available to him and his prospect of attaining such a position in relation to other qualified individuals. There was no evidence as to when Wilburn could expect to attain such a position, what his anticipated work-life as a barge captain would be, or what salary he would receive.

A plaintiff may recover compensatory damages for loss of future earning capacity in Jones Act and FELA cases. See Fashauer v. New Jersey Transit Rail Operations, Inc., 57 F.3d 1269, 1284 (3d Cir. 1995). The plaintiff must produce, however, "competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him." Gorniak v. National R.R. Passenger Corp., 889 F.2d 481, 484 (3d Cir. 1989) (citing Wiles v. New York, Chicago, and St. Louis R.R. Co., 283 F.2d 328, 332 (3d Cir. 1960)).

Under the law of this circuit, a plaintiff may recover an award for future lost earning capacity,

17

> if he has produced competent evidence suggesting that
> his injuries have narrowed the range of economic
> opportunities available to him. This means that a
> plaintiff need not, as a prerequisite to recovery, prove
> that in the near future he will earn less money than he
> would have but for his injury. Rather, a plaintiff must
> show that his injury has caused a diminution in his
> ability to earn a living. Such a diminution includes a
> decreased ability to weather adverse economic
> circumstances, such as a discharge or lay-off, or to
> voluntarily leave the defendant employer for other
> employment.

Id. at 484 (citation omitted).

In Wiles v. New York, Chicago, and St. Louis Railroad Co., 283 F.2d 328 (3d Cir. 1960), this court reversed the district court's order setting aside the jury's award for loss of future earning capacity. See id. at 332. Due to his employer's negligence, Wiles sustained a back injury and had a series of back operations resulting in permanent scars and a minor back deformity. See id. at 331. At trial, Wiles introduced expert medical testimony showing that,

> he would have difficulty in getting a job in heavy
> industry elsewhere than with the Railroad for most
> heavy-industry employers require physical
> examinations. Such an examination would compel
> Wiles to disclose the nature of his operations and that
> he had a history of disc protrusion and back fusion
> and these disclosures would militate against his
> securing employment.

Id. Although Wiles was employed with the Railroad at a salary greater than what he had been earning at the time of his injury, this court held that "[t]he availability to Wiles of the labor market for heavy-duty workers was certainly a factor which the jury was entitled to take into consideration in fixing an amount for damages due to him for loss of future earning power." Id. at 332.

In Gorniak v. National Railroad Passenger Corp., 889 F.2d 481 (3d Cir. 1989), Gorniak was injured while working as a materials handler for Amtrak. See id. at 482. After his injury, he was given another job with Amtrak as a ticket

18

clerk, which paid him more than his job as a materials handler. See id. Although Gorniak's injury did not affect his ability to perform his new job, or other light-duty positions with Amtrak, Gorniak testified that under the seniority provisions of the collective bargaining agreement between his union and Amtrak, he could be displaced by a more senior employee if Amtrak were to cut back on its force of light-duty workers. See id. If that were to happen, Gorniak stated that the only position available within his craft at Amtrak might be as a materials handler, which his injury precluded him from performing. See id. Notwithstanding the evidence of Gorniak's secure employment as a ticket clerk and the slight probability of being precluded from holding any light-duty job with Amtrak, this court held that "the district court did not err in allowing Gorniak's lost earning capacity claim to go to the jury." Id. at 484.

At trial Wilburn introduced evidence of both physical and psychological limitations caused by his traumatic experience that limit his economic opportunities. Dr. Steven Newman testified that Wilburn has permanent injury to his left shoulder resulting in mobility and functional limitations in both his shoulder and arm. With these permanent injuries, Wilburn is restricted from performing activities that involve overhead or repetitive reaching and stretching, pushing or pulling, and very strenuous activities. Performing these activities is both painful for Wilburn and can be expected to exacerbate the injury. Despite his injuries, Wilburn has continued to work as an AB tankerman. He compensates for his limitations by using his right arm and hand.

Wilburn testified that as a result of his harrowing experience, he has a fear of sailing coastwise--that is leaving the sight of land. Although he has made eight to ten coastwise trips during good weather, he fears that if he were on a coastwise trip during bad weather, he would be unable to go out on deck to perform his mariner's duties even if he were ordered to do so.

Dr. Robert Sadoff, a forensic psychiatrist, testified that Wilburn suffers from post-traumatic stress syndrome, and his fears of sailing coastwise are consistent with that diagnosis. While Wilburn has made progress in overcoming

his fears, and has made some voyages coastwise, he would need to undergo a behavioral desensitization program in order to overcome his "realistic reasons for being afraid." Such a program, however, is "not practical because you have to deal with companies who own ships and they're not there for [Wilburn's] therapy." In absence of a desensitization program, Dr. Sadoff testified "I just don't think that without treatment, as I have outlined it, he's going to go much further than he is now. . . . [H]e's gone pretty far in what he's done, but he's limited and he's reached a kind of plateau at this point . . . ."

Wilburn testified that he made a bid for a barge captain position, but withdrew his name when Richard Steady, Maritrans's port captain, told him he would never get a barge captain position as long as he would not go coastwise. Wilburn also stated that he was concerned about bidding on barge captain positions because as a barge captain, he would lose his union protection; therefore, even if he were successful in obtaining a barge captain position on an inland barge, the company could transfer him to a coastwise barge or fire him if he refused to go coastwise. Although Steady denied telling Wilburn that he would never become a barge captain if he were unwilling to go coastwise, Steady testified that an inland barge could be required to go coastwise.

We conclude that the evidence, when viewed in the light most favorable to Wilburn, demonstrates a narrowing of Wilburn's economic opportunities and provides a sufficient basis upon which the jury could have decided to compensate Wilburn for loss of future earning capacity. The fact that Wilburn has continued to work as an AB tankerman since the accident and has compensated for his physical injuries by using his right arm does not preclude a recovery for loss of future earning capacity. Rather, those were factors the jury could consider in deciding whether Wilburn's economic prospects have been narrowed or whether he "is chained to his present job in a kind of economic servitude." Wiles, 283 F.2d at 332. Finally, while there is a conflict in testimony as to whether Wilburn was told he could never become a barge captain due to his psychological limitation, "[i]t was the duty of the jury to

20

resolve the conflicting testimony and it did so in favor of [Wilburn]." Id. at 330.

B. Order Granting a Motion for a New Trial

The jury awarded Wilburn a total of two million dollars in compensatory damages. One million dollars of that amount was awarded for loss of future earning capacity. Wilburn also seeks reversal of the district court's conditional order granting a new trial on the issue of damages. The district court held that the award of damages was against the weight of the evidence and excessive.

This court generally reviews the grant of a new trial for abuse of discretion. See Klein v. Hollings, 992 F.2d 1285, 1289 (3d Cir. 1993). "Our degree of scrutiny, however, differs depending on the reasons for granting the new trial." Id. An appellate court exercises a closer degree of scrutiny when the district court grants a motion for new trial because it believes the jury's verdict is against the weight of the evidence. See id. at 1290. We do so because the district court has " `to some extent at least, substituted [its] judgment for that of the jury.' " Id. (quoting Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991) (alteration in original)). Closer scrutiny is especially warranted in cases involving simple factual determinations well within the comprehension of the jurors. See Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 201 (3d Cir. 1996).

Despite this closer degree of scrutiny, "we recognize that considerable deference remains due to [the district court's] determination that a verdict is against the weight of the evidence. The trial judge observes `the witnesses and follow[s] the trial in a way that we cannot replicate by reviewing a cold record.' " Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991) (quoting Roebuck v. Drexel Univ., 852 F.2d 715, 735 (3d Cir. 1988)) (second alteration in the original). This court has also noted that "reversal of a judgment [as a matter of law] upon a finding of sufficient evidence to support the jury's verdict does not preclude affirmance of a new trial order arising from the conclusion that the verdict is against the weight of the evidence." Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 211 (3d Cir. 1992).

21

Balancing these competing interests, this court has held that "new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson, 926 F.2d at 1353.

The district court concluded that the award of one million dollars for loss of future earning capacity was excessive and not supported by the evidence. We agree.

We use the shockingly excessive standard to review jury verdicts, but "review the calculation methods of a jury in cases which are `susceptible to mathematical formula.' " Peco Energy Co. v. Boden, 64 F.3d 852, 858 (3d Cir. 1995) (quoting Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1279 n.19 (3d Cir. 1979)). Loss of future earnings capacity is subject to mathematical calculation. See, e.g., Williams v. Rene, 72 F.3d 1096, 1102 (3d Cir. 1995); Gorniak v. National R.R. Passenger Corp., 889 F.2d 481 (3d Cir. 1989). "Although the determination of such damages often involves a host of uncertain contingencies, the verdict must still have its basis in evidence, not conjecture." Hoffman v. Sterling Drug, Inc., 485 F.2d 132, 143 (3d Cir. 1973).

Wilburn was thirty-eight years old at the time he was injured. The evidence showed that he had been receiving $44,000 a year as an AB tankerman. The pay for a barge captain is $50,000 a year. Assuming a retirement age of 65, the gross loss of earnings would be approximately $162,000. That is far less than the one million dollars awarded by the jury.

In FELA and Jones Act cases, "a defendant is`entitled to have the jury instructed that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.' " Gorniak, 889 F.2d at 485 (quoting St. Louis Southwestern Ry. Co. v. Dickerson, 470 U.S. 409, 411 (1985) (internal quotation marks and citation omitted)). While making the present value determination is a job for the jury, not the court, see id., the plaintiff has the burden "to produce evidence permitting a rational reduction to

22

present value . . . ." Id. at 486. We noted the following in Gorniak:

> In most of the reduction to present value cases which have been decided by this court the principal focus has been on whether the plaintiff produced sufficient evidence to guide the jury in determining an appropriate discount factor and in performing the mathematical calculations involved in reducing an award to present value. In these cases the dangers that the juries' damage awards were based on mere conjecture or guesswork were too high to support the awards, since the juries had been provided with no guidance as to the appropriate formula to use to reduce the awards. In Russell, for example, we held that "[t]he determination of the appropriate interest rate and the computation of present value on the basis of it involve[ ] facts and mathematical procedures of which the jury could not be assumed to have personal knowledge from their own prior experience. They were, therefore, entitled to receive evidence and appropriate mathematical guidance with respect to these matters if they were to act rationally and not upon mere conjecture or guess."

Id. at 486 n.4 (quoting Russell v. City of Wildwood, 428 F.2d 1176, 1183 (3d Cir. 1970)) (other citations omitted).

Here, the jury was instructed to reduce the loss of future earning capacity award to its present value, however, Wilburn presented no evidence to guide the jury in its determination. On this basis alone, we would be required to determine that the district court did not abuse its discretion in granting a new trial on Wilburn's loss of future earning capacity.

The district court did not abuse its discretion infinding that the jury's award of one million dollars for loss of future earning capacity was not supported by the evidence and was excessive.

The district court also held that the jury's award of one million dollars for Wilburn's physical and psychological damage was excessive and not supported by the evidence. Wilburn suffered injuries to his left shoulder and knee.

23

Physical therapy has improved the condition of his knee. His left shoulder has not responded to treatment. He has continued to work for Maritrans as an AB tankerman. In performing his duties, however, he must compensate for his limitations by using his right arm and hand. He is unable to participate in the recreational activities he formerly enjoyed such as wind-surfing, softball, and basketball.

Wilburn's experience in being thrown overboard by a giant wave has caused him to suffer from a post-traumatic stress disorder. He is now afraid of ocean storms. He will not leave the sight of land if there is a chance of bad weather. As a result of his fear, he believes that he could not go on deck to perform his job if he were in a storm off the coast. He also feels his psychological disorder cannot be treated successfully.

In ordering a new trial on this issue, the district court reasoned as follows:

> Despite Wilburn's claimed fears, his psychological expert testified that Wilburn has made much progress over the last three and a half years and will continue to improve. In addition, Wilburn has sailed coastwise approximately eight to ten times and has performed his duties satisfactorily. Wilburn's psychological expert has opined that with up to one year of treatment, Wilburn's prognosis for a full recovery is good. Although the residual pain in his shoulder is permanent in nature, it has not prevented Wilburn from performing his job.

The record supports the district court's factualfindings. After returning to work after a two-months' absence, Wilburn did not miss a day's work in the three and one-half years prior to the commencement of trial. No one had complained that his job performance was unsatisfactory. He continues to exercise and stretch his shoulder in order to maintain as much strength in it as possible. He has not been required to undergo any surgical procedures.

With respect to his psychological trauma, Dr. Sadoff testified that the symptoms Wilburn experienced after the accident -- flashbacks, nightmares, difficulty sleeping, and depression -- have all improved. His symptoms of

24

irritability, withdrawal, and excessive startle reaction have also improved and are likely to continue to do so.

Regarding Wilburn's fear of storms at sea, Dr. Sadoff testified that Wilburn has a good prognosis for a complete recovery if he undergoes the behavioral sensitization program that Dr. Sadoff outlined. While Dr. Sadoff testified that the program is not practical to implement because it requires the cooperation of a company that owns ships, Dr. Sadoff also testified that Wilburn might be able to overcome his fear of storms at seas in the same manner that has allowed him to take several coastwise trips during good weather. Dr. Sadoff testified as follows:

> There may be some other steps that he could take. I don't think he's going to get to the point where anybody is going to take him out on an excursion just for the point of helping him deal with his anxieties.
>
> But if, for example, if he's on board and there is a storm and they have to go out or they are out at sea, maybe going to Norfolk or up to New York, and a storm comes up unexpectedly and he's on board and if he handles it and deal with it -- doesn't panic and doesn't run below deck -- it may be that would be an impetus for the next step after that.
> . . .
>
> But I just can't plan for that.

Dr. Sadoff also testified that he reviewed a psychiatrist report prepared by Dr. Harold Byron, a psychiatrist Wilburn was referred to by his counsel. Dr. Byron's report stated that Wilburn had a good prognosis for recovery with treatment.

Under these circumstances, we are persuaded that the district court did not abuse its discretion in finding that an award of one million dollars for Wilburn's physical and psychiatric disorders is excessive.

CONCLUSION

The district court erred in excluding the opinion testimony of lay witnesses. A judgment as a matter of law

25

must be reversed if the insufficiency of the evidence is attributable to the district court's evidentiary rulings.

The district court properly granted the motion for a new trial on liability, however, for a different reason than asserted by the district court. Expert testimony was not required to establish whether Captain Hearn was negligent in the disconnection of the Samson line; rather, this was only one of several theories alleged by Wilburn. The failure to utilize special verdicts regarding the basis for the jury's findings precludes us from determining whether this was the theory adopted by the jury in reaching its verdict. Similarly, several theories of unseaworthiness were alleged. Because at least one of the theories of unseaworthiness was beyond the common knowledge of the jury, the use of a general verdict makes it impossible for us to decide which theory of liability persuaded the jury. Accordingly, we must affirm the order granting a new trial.

The evidence was also sufficient to withstand a motion for a judgment as a matter of law on the question whether Wilburn's injuries limited his future earning capacity because of his fear of performing the duties of a barge captain on a coastwise voyage during a storm. We conclude, however, that the district court did not abuse its discretion in granting a motion for a new trial because the jury's award of one million dollars for lost future earnings far exceeded the difference between the pay of an AB tankerman and that of a barge captain.

The record also supports the district court's exercise of its discretion to grant a motion for a new trial regarding the award of one million dollars to compensate Wilburn for his physical and psychological injuries. This amount appears to be excessive in light of the fact that his physical injuries do not preclude him from performing his duties as an AB tankerman and his psychological condition has significantly improved.

Upon remand, the district court is directed to enter an order vacating the judgment as a matter of law on the issue of liability and the demand for damages for lost future earnings.

26

AFFIRMED in part, REVERSED in part, with directions.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

27