GORNIAK, Joseph P.

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, a/k/a Amtrak, Appellant.**

No. 88–1698.

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1989.

Decided Nov. 14, 1989.

Thomas F. Reilly (argued), Gallagher, Wheeler, Reilly & Lachat, Philadelphia, Pa., for appellant.

Joseph Smukler (argued), Meyer, Lasch, Hankin & Poul, Philadelphia, Pa., for appellee.

Before STAPLETON, MANSMANN and GARTH, Circuit Judges.

**OPINION OF THE COURT**

STAPLETON, Circuit Judge:

I.

Plaintiff Joseph P. Gorniak is an employee of defendant National Railroad Passenger Corporation, better known as Amtrak. On February 11, 1985, Gorniak was employed as a materials handler at Amtrak's Cornwell Heights, Pennsylvania facility. That day he injured his right shoulder while lifting a cylinder weighing over 325 pounds.

Gorniak filed suit against Amtrak under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 et seq., alleging that Amtrak's negligence caused his injury. A jury returned a verdict for plaintiff in the sum of $104,000, which was reduced by 10% because of Gorniak's contributory negligence. Thirty-five thousand dollars of the verdict was for Gorniak's loss of future earning capacity.

The trial court molded the verdict, and entered a judgment for plaintiff in the amount of $89,063.52. This judgment reflected not only the offset for plaintiff's contributory negligence, but also the court's reduction of the $35,000 impaired earning capacity award to a present value of $29,981.69. After post-trial motions were denied, Amtrak timely appealed to this court, raising only two issues. First, Amtrak alleges that there was insufficient evidence to allow a jury to consider awarding Gorniak damages for loss of future earning capacity. Second, Amtrak insists that even if the jury was properly permitted to make such an award, the trial court erred by finding that Gorniak would likely retire at age 65 or before for purposes of reducing that award to present value.

II.

The evidence relevant to Gorniak's claim for loss of future earning power is relatively straight-forward. Because of his shoulder injury Gorniak underwent surgery and a lengthy process of physical therapy. While the surgery and therapy were successful to a degree, two orthopedic surgeons testified that the injury had resulted in a permanent disability of Gorniak's right shoulder which required him to refrain from activities involving heavy lifting or overhead extensions of his right arm. Specifically, Dr. Ruth testified that Gorniak should permanently avoid activities requiring him to lift more than 20 to 30 pounds or involving repeated overhead extensions. App. 189–90. Dr. Fenlin stated that Gorniak had been instructed to never lift more than 50 pounds to chest level, or more than 25 pounds above his head. App. at 448.

After his injury, Gorniak was first assigned by Amtrak to a position as a ticket clerk, a position which paid seven dollars a day more than his pre-injury position as a materials handler. Gorniak acknowledges that the shoulder disability does not hinder his ability to work as a ticket clerk. Moreover, Gorniak is able to work in certain other positions within his craft at Amtrak, as a reservations clerk for example, and has worked as a security guard on the side since his injury. However, Gorniak testified that the collective bargaining agreement between his union and Amtrak provides for a seniority system which allows more senior employees, in the event of a reduction in force, to bump their junior colleagues from positions they hold. As a result, if Amtrak were to cut back on its force of light-duty workers, Gorniak could be displaced from his present position. If this were to occur, the only position available within his craft at Amtrak might be the position he held at the time of his injury, that of a materials handler.

Gorniak testified that he could not work as a materials handler at Amtrak since the railroad would not permit him to do so while adhering to the lifting restrictions imposed by his doctors. He did admit, however, that the probability that he would

be bumped out of his current light-duty position was small since he was the 101st most senior member of the 1200 member union, and that most of the positions filled by members of his union involved working on a computer. Nevertheless, Gorniak also testified that he had been bumped from his position as a ticket clerk by an Amtrak employee who ranked 76th in seniority, and was presently holding another light-duty clerk's job.

Amtrak argues that the foregoing evidence provides no reasonable basis upon which to conclude that Gorniak suffered a loss of earning capacity as a result of his shoulder injury. Though Gorniak cannot return to a position such as he held at the time of his injury, he is fully able to obtain employment of a less strenuous nature. Indeed, Gorniak is presently employed in a secure manner in such a position with Amtrak, and makes more money per day than he did prior to his injury; further, Gorniak has worked, without discomfort, as a security guard subsequent to his shoulder injury. In sum, Amtrak says no rational trier of fact could have concluded that Gorniak's economic horizons had narrowed as a result of his shoulder disability.

In support of this conclusion, Amtrak cites a recent decision of the Court of Appeals for the Second Circuit, *DeChico v. Metro–North Commuter R.R.*, 758 F.2d 856 (2d Cir.1985). In *DeChico* the court upheld a district court's refusal to allow a jury to consider a FELA plaintiff's lost earning capacity claim. The plaintiff, a railroad shop superintendent, had returned to the same position he held prior to his knee injury and was earning a higher wage. At trial, the plaintiff testified that he expected to continue with the railroad in another capacity if he lost his current position. The Court of Appeals held that any suggestion that plaintiff would be forced to leave the railroad's employ was too speculative to support an award for loss of future earning capacity, and that the district court properly refused to charge the jury on that theory. *Id.* at 861.

*DeChico*, however, expresses a narrower view of a lost earnings capacity claim than was adopted by this Court in *Wiles v. New York, Chicago, and St. Louis Railroad Co.*, 283 F.2d 328 (3d Cir.) *cert. denied*, 364 U.S. 900, 81 S.Ct. 232, 5 L.Ed.2d 193 (1960). *Wiles* was an appeal from a 1959 FELA judgment by a plaintiff whose $20,000 jury award for loss of earning capacity had been set aside by the district court. The plaintiff Wiles was injured when the jack he was using to lift a rail car slipped and threw him to the ground. As a result, his back was seriously injured and he underwent three operations, resulting in permanent scarring and a minor deformity of the back.

At trial, an expert medical witness testified that Wiles would have difficulty obtaining employment in heavy industry other than with the defendant railroad because no employer would wish to hire him after discovering, by way of a routine pre-employment physical, his history of back problems. The expert did not, however, testify that Wiles was physically unable to continue employment in heavy industry. *Id.* at 331, n. 3. Indeed, at the time of trial, plaintiff was employed by the defendant railroad as a car repairman at a higher salary than he was paid at the time of the accident.

After submitting an interrogatory on the issue of lost earning capacity to the jury and receiving a jury award of $20,000 for Wiles, the district court set aside the award on the ground that it was based on speculation. On appeal this court reversed and reinstated the verdict. We noted that Wiles' employment in a higher paying position did not preclude a recovery for loss of earning capacity, but was merely one of several factors for the jury to consider in deciding whether Wiles' economic prospects had been narrowed by his injury. *Id.* at 332; *see also Moore v. Chesapeake & Ohio Ry*, 649 F.2d 1004, 1011 (4th Cir. 1981). The jury was also entitled to consider whether Wiles might be laid off or discharged in the future and whether he was "chained to his present job in a kind of economic servitude" because other employers were unlikely to risk hiring him. *Id.*

We held that the presence of these and other factors provided a sufficient basis upon which the jury could have decided to compensate plaintiff for loss of future earning power; moreover, we concluded that the amount of lost earning capacity damages awarded was no more a result of speculation than a typical pain and suffering award. After all, "[s]ince none of us is capable of foreseeing the future with any substantial degree of certainty every estimate of damages must contain elements of speculation." *Id.*

We read *Wiles* as allowing a FELA plaintiff to recover a verdict for future lost earning capacity if he has produced competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him. *Id.* This means that a plaintiff need not, as a prerequisite to recovery, prove that in the near future he will earn less money than he would have but for his injury. Rather, a plaintiff must show that his injury has caused a diminution in his ability to earn a living. Such a diminution includes a decreased ability to weather adverse economic circumstances, such as a discharge or lay-off, or to voluntarily leave the defendant employer for other employment. *Wiles* also expresses a preference for leaving the resolution of any uncertainty about whether such circumstances will come to pass to a properly instructed jury; a jury that may consider and weigh all the relevant factors and determine what price to place on a narrowing of a plaintiff's economic horizons.

■ Under the standard articulated in *Wiles*, it is apparent that the district court did not err in allowing Gorniak's lost earning capacity claim to go to the jury. Expert testimony indicated that Gorniak was subject to permanent physical restrictions, restrictions that would preclude him from working as a materials handler or store attendant in an Amtrak warehouse, and in many positions in the industrial workforce outside Amtrak. This makes Gorniak's case considerably stronger than Wiles', since Wiles had no permanent physical restrictions precluding him from even heavy industrial employment. And though Gorniak was fairly senior in his union, he had been bumped from his post-injury position as a ticket clerk to another light-duty job by a worker with greater seniority. If he were bumped to a position as a materials handler, Gorniak testified that he would have to leave Amtrak's employ since such a position was beyond his physical capacity. While Amtrak argues it is unlikely that Gorniak will lose his light-duty job, it has not guaranteed Gorniak that such a position will be available within reach of his home in Holland, Pennsylvania. Indeed, evidence at trial indicates that Amtrak has closed one of its Pennsylvania facilities and has abolished jobs in plaintiff's craft at another during Gorniak's employment with Amtrak. Moreover, even if such a position were made permanently available to Gorniak, Gorniak could still recover since he is under no obligation to remain with Amtrak, and the fact that his injuries hindered his ability to obtain other employment if he wished was one the jury could consider in deciding to award him damages.[1]

We, of course, do not suggest that the record lacks evidence that would have supported a contrary jury finding. We simply find that Gorniak produced sufficient evidence to allow a rational fact-finder to conclude that his future earning capacity was significantly diminished because of Amtrak's negligence.

### III.

Amtrak's second claim of error contests the manner in which the district court reduced plaintiff's lost earning capacity claim to present value. Specifically, Amtrak attacks the district court's decision to apply the stipulated 2% discount rate to the $35,000 jury award over a period of 15

---

**1.** Contrary to Amtrak's assertions, the fact that Gorniak testified to being able to work as a security guard on the side does not indicate that his prospects for employment outside of Amtrak have not been narrowed by his injury. Gorniak indicated that his hourly pay as a security guard was about half of that which he made at Amtrak.

years as lacking sufficient evidentiary support in the trial record.[2]

Review of this contention requires an understanding of the somewhat unusual posture in which this issue is presented. Under FELA, a defendant is "entitled to have the jury instructed that 'when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.'" *St. Louis Southwestern R. Co. v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 1348, 84 L.Ed.2d 303 (1985) (*quoting Chesapeake & Ohio R. Co. v. Kelly*, 241 U.S. 485, 491, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916)). Further, the task of making the present value determination is normally one for the jury not the court. *Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330, 108 S.Ct. 1837, 1845, 100 L.Ed.2d 349 (1988). At the charge conference, Amtrak made its argument, discussed in Section II of this opinion, against giving any instruction to the jury on lost earning capacity; however, it acquiesced in Gorniak's suggestion that the task of reducing any lost earning capacity award to present value be entrusted to the district court. Thus, the district court's charge referred to Gorniak's work life only in the following passage:

> Now, your calculation of what the plaintiff can be reasonably expected to lose in future income must be based on the plaintiff's working life, that is on how long he would have worked but for his injuries. In calculating Mr. Gorniak's life, you should bear in mind that Mr. Gorniak is now 49 years of age, and you will consider most people stop working at some point—certainly before they die.

App. at 405. Amtrak did not object to the manner in which the lost earning capacity issue was presented to the jury or request an interrogatory asking the jury to make a specific finding about the expected duration of Gorniak's work life.

After the verdict, the parties presented the district court with their views about reducing the jury's $35,000 lost earning capacity award to present value. They agreed to a discount rate of 2%. There was a difference of opinion, however, as to the term of years over which this rate should be applied.

The district court opted for a 15 year period, a period based on the view that Gorniak would retire at 65, and entered a judgment reflecting this choice. Amtrak filed a motion to amend the judgment insisting that there was no evidence supporting a finding that Gorniak would retire at 65, and that the judgment should be amended to reflect a reduction based on a work life coextensive with Gorniak's life expectancy of 24 and one-half years. The district court denied this motion, adhering to the view that a 15 year work life estimate was the most reasonable period for reduction to present value based on the trial record.

On appeal, Amtrak reiterates the argument found unavailing below. Addressing this argument requires us to engage in a very narrow inquiry. By handling the reduction to present value issue in the manner they did, both parties agreed: (1) that the district court would instruct the jury on lost earning capacity without reference to reducing the award to present value, (2) that the jury would not report to the court its determination with respect to Gorniak's expected retirement date, and (3) that the district court would reduce any lost earning capacity award to present value. When entering this agreement, Amtrak necessarily understood that the district court would have to reach a decision on Gorniak's work life expectancy independent of the jury's analysis of this issue. As a result, Amtrak may not complain that the district court may have used a different work life estimate in reducing the jury's lost earning capacity award to present value than the jury used in making that award. The only question then becomes whether there was evidence produced at trial from which a rational trier of fact could find it more

---

**2.** The effect of this choice is to leave the plaintiff with a lost earnings capacity claim of $29,981.69 as opposed to $27,582.77.

likely than not that Gorniak would retire no later than age 65.

Amtrak's argument stresses two things about the record. The first is the absence of any testimony that plaintiff intended to retire at age 65 or any other age short of death. The second is that the "only evidence ... dealing with future life expectancy, work or otherwise, was 24.5 years." Amtrak Br. at 26. Since the plaintiff bears the burden of producing evidence from which the trier of fact may make a rational reduction to present value of a lost earnings award, *DiSabatino v. National R.R. Passenger Corp.*, 724 F.2d 394, 395 (3d Cir.1984); *Ballantine v. Central Railroad of New Jersey*, 460 F.2d 540 (3d Cir.) *cert. denied*, 409 U.S. 879, 93 S.Ct. 133, 34 L.Ed.2d 133 (1972), Amtrak argues that Gorniak must bear the costs flowing from his failure to introduce any evidence supporting the theory that he would retire at 65 or before.

While we agree with Amtrak that the law of this circuit places the burden on the plaintiff to produce evidence permitting a rational reduction to present value, we disagree with its assertion that Gorniak produced insufficient evidence to allow a trier of fact to conclude that a retirement at 65 or before was more likely than not.

Though any determination about a plaintiff's work life is somewhat hazardous [3], this is a matter, in contradistinction to the determination of an appropriate discount factor for example,[4] in which a factfinder may apply his or her own general sense about the ages at which persons commonly retire to the particular circumstances of the plaintiff before it. In this case, the district court had a good deal of knowledge about Gorniak. It knew that he was 49 years old and would turn 65 approximately 15 years after the judgment was entered. Gorniak had been steadily employed throughout his adult life, having spent 11 years with General Electric shortly before going to work for Amtrak. He was married, and had three children, all but one of whom had left the nest by the time of trial. He was a relatively senior member of the Brotherhood of Railway and Airline Clerks, employed by a large public railroad. He had accrued time toward railroad retirement since September of 1972. We believe the district court could rationally infer that Gorniak, throughout the period from 1972 to his 65th birthday in 2003, would accrue railroad pension benefits to provide for his retirement in addition to any benefits which may have vested during his eleven years as an employee of General Electric. The district court could also permissibly infer that Gorniak's wages at Amtrak, when combined with income from a part-time job as a security guard, were adequate to permit him to save from current income for retirement. Finally, the district court could take judicial notice of the federal statute providing that Gorniak would qualify for his full

---

**3.** "The lost stream's length cannot be known with certainty; the worker could have been disabled or even killed in a different, non-work-related accident at any time. The probability that he would still be working at a given date is constantly diminishing. Given the complexity of trying to make an exact calculation, litigants frequently follow the relatively simple course of assuming that a worker would have continued to work up until a specific date certain." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533–34, 103 S.Ct. 2541, 2548–49, 76 L.Ed.2d 768 (1983).

**4.** In most of the reduction to present value cases which have been decided by this court the principal focus has been on whether the plaintiff produced sufficient evidence to guide the jury in determining an appropriate discount factor and in performing the mathematical calculations involved in reducing an award to present value. *See, e.g., Ballantine*, 460 F.2d 540; *Haddigan v. Harkins*, 441 F.2d 844 (3d Cir.1970); *Russell v. City of Wildwood*, 428 F.2d 1176 (3d Cir.1970). In these cases the dangers that the juries' damage awards were based on mere conjecture or guesswork were too high to support the awards, since the juries had been provided with no guidance as to the appropriate formula to use to reduce the awards. In *Russell*, for example, we held that "[t]he determination of the appropriate interest rate and the computation of present value on the basis of it involved facts and mathematical procedures of which the jury could not be assumed to have personal knowledge from their own prior experience. They were, therefore, entitled to receive evidence and appropriate mathematical guidance with respect to these matters if they were to act rationally and not upon mere conjecture or guess.". 428 F.2d at 1183.

railroad pension on his 65th birthday.[5]

With this information available to the trial judge, we do not think it fatal either that Gorniak did not testify as to a present intention of retiring on a particular date or that his counsel failed to offer in evidence the usual work life expectancy table. A plaintiff who has not yet formed a specific intent with respect to retirement should not have to forego a lost earning capacity award when the trier of fact can infer that, given all the surrounding circumstances, the odds favor retirement at or before the normal retirement age. Moreover, we believe the chain of inferences necessary to permit a trier of fact to go from a work life expectancy table to a retirement date for a plaintiff in a particular case is no less attenuated than the chain of inferences that the district judge chose to draw in this particular instance.

It is, of course, true that Gorniak may be forced to work beyond 65 because of adverse economic circumstances or may choose to do so because he winds up preferring work to leisure. Nevertheless, we conclude that the district court could rationally conclude from this record that Gorniak will more likely cease working at 65 or before, than at some older age. This conclusion is all that is required to sustain the challenged award.[6]

## IV. *Conclusion*

The judgment of the district court will be affirmed.

GARTH, Circuit Judge, dissenting:

I agree with the majority of the court that the district court did not err in allowing the jury to consider Gorniak's loss of future earning capacity. I disagree with the majority, however, when it permits the district court to use a 15–year period, rather than a 24–year period, to reduce future earning losses to present worth.[1]

It will be remembered that the jury awarded the plaintiff $104,000 in damages, of which $35,000 was for loss of future earning capacity. Although it is normally the jury which determines the rate and the reduction of future earning damages to present value (*see Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988)), the parties in this case agreed to have the district court make that determination. The district court thereupon reduced the loss of the future earning capacity determined by the jury at $35,000 to its present value—$29,981.69—based on an agreed discount rate

---

5. *See* 45 U.S.C. § 231a(a)(1)(i). As Gorniak was born on November 18, 1937 he may receive full retirement benefits starting on his 65th birthday. *See* 42 U.S.C. § 416(*l*)(1)(A). These benefits include an annuity equal to the social security benefits to which a non-railroad worker with Gorniak's work and earnings history would have been entitled plus an increased annuity for Gorniak's years as a railroad employee. 45 U.S.C. § 231b(a)(1), (b)(1).

6. Our colleague writing in dissent quotes extensively from the district court's post-trial opinion and suggests that it reflects an analysis at odds with that we have used to uphold the judgment. However, nothing said by the district court is inconsistent with the notion that it simply applied common sense to the wealth of information it had about Gorniak. Most of the quoted discussion is not an analysis of the record support for the district court's decision on when Gorniak was likely to retire, but rather a commentary on a concern about whether there was reason to believe the court's decision on work life was consistent with that of the jury, a concern we believe Amtrak is not in a position to raise. We feel quite confident that the learned trial judge did not mean to suggest that his own instructions to the jury or an argument of counsel could serve as a substitute for evidence. What is apparent is that the district court felt that adopting Amtrak's suggestion that Gorniak would continue working until he died "require[d] a tortured analysis of both ... common experience and the trial transcript." App. at 459a. This suggests that the district court did precisely what we suggested it was entitled to do and applied its own common sense to the considerable record evidence concerning Gorniak's economic and family circumstances to arrive at a conclusion about when he would be likely to retire.

1. In *Russell v. City of Wildwood*, 428 F.2d 1176, 1180 (3d Cir.1970), present worth was defined as:

   ... merely a single sum of money which would be sufficient at a specified rate of interest to provide a certain amount of money each year for a specified number of years, and at the end of that time that fund would be entirely exhausted.

of 2% applied to a loss of earnings over 15 years. Had the 24–year term been utilized instead of the 15–year term, the lost earnings capacity claim would have been in the amount of $27,582.77.

While the difference between the two amounts is roughly $2,400, the principle involved is, in my opinion, a much more significant factor. My reason for parting company from the majority is that no evidence appears in the record to warrant the district court's use of a 15–year period. Rather, in the present case, the evidence of the appropriate term—and the *only* term evidence—was that Gorniak at age 49 had a life expectancy of an additional 24½ years. That evidence came from the Life Tables published by the U.S. Department of Health, Education and Welfare which are standard tables of mortality. The district court had judicially noticed and received these tables in evidence with respect to the relevant term to be used to reduce future earning losses to present value.

In determining that it would use a 15–year term rather than a 24–year term, the district court rejected Amtrak's argument that the record revealed no evidence that Gorniak would retire at age 65, the age at which use of a 15–year period would be appropriate. The district court stated in its opinion denying Amtrak's motion for a new trial or to amend judgment, that:

Although the jury was not asked to specify the number of years on which they based their future earnings award, I find fifteen years to be the most reasonable period for reduction to present value and thus not in error.

I instructed the jury on three distinct categories of damages: loss of earnings, loss of future earning capacity, and pain and suffering. The relevant instruction on future earnings read:

Now, your calculation of what the plaintiff can be reasonably be [sic] expected to lose in future income must be based on the plaintiff's working life, that is on how long he would have worked but for his injuries. In calculating Mr. Gorniak's probable working life, you should bear in mind that Mr. Gorniak is now 49 years of age, and

you will consider at what age it is reasonable to suppose Mr. Gorniak will retire, since most people stop working at some point before—certainly before they die. Transcript at 136.

The portion of my charge relating to the plaintiff's twenty-four-year life expectancy was part of the instruction on damages for pain and suffering. I explained that this claim encompassed damages for pain and suffering in the past and future, meaning by future "for the rest of his life." I then told the jury that plaintiff, who was 49 at the time of trial, had a 24.5 year life expectancy according the United States mortality tables.

The defendant argues that the jury must have calculated damages for future earnings by assuming that plaintiff would continue to work for twenty-four more years until his projected death, rather than for fifteen years until he turned 65. However, the jury instructions explicitly distinguished plaintiff's working life as something distinct from—and less than—his full life span. It is improbable that the jury would nevertheless assume that plaintiff would work until forced to stop by his projected death at age 73. No evidence suggested plaintiff would work so long.

*The fifteen-year figure is based on a round estimate of plaintiff's retirement at age 65. This is a common retirement age familiar to most people. It is also the only age mentioned at trial, although not specifically as evidence,* in regard to calculation of plaintiff's future earnings. When discussing future earnings loss in his closing remarks, plaintiff's counsel, who had every reason to extend the period for damages, stated: "If for the next 16 years, to, let's say, age 65 he is able to keep a light-duty job, he's not going to lose anything in the future." Transcript of Nov. 6, 1987, at 86. Tilting the ambiguity of the jury's award to twenty-four years requires a tortured analysis of both our common experience and the trial transcript. (emphasis added.)

App. at 458a–459a.

The majority correctly acknowledges that the plaintiff bears the burden of pro-

ducing evidence from which the jury (in this case, as I have explained above, by the judge) may make a rational reduction to present value of a lost earnings award. *DiSabatino v. National R.R. Passenger Corp.,* 724 F.2d 394 (3d Cir.1984); *Russell v. City of Wildwood,* 428 F:2d 1176 (3d Cir.1970). In *Russell,* the need for evidence of the present worth factors was emphasized. We said:

> [The defendant] contends that the plaintiff should have supported his claim for the present value of his future losses either by actuarial proof or other evidence from which the jury could have computed the present discounted value of the plaintiff's future lost earnings in a rational way. Since, says the defendant, the jury did not have before them any such evidence or instruction, their verdict, as to this element of the plaintiff's claim, must have been based on pure conjecture or speculation which rendered the entire verdict invalid.

428 F.2d at 1180. After reciting the defendant's argument in *Russell,* we sustained the defendant in his contention. We stated:

> Moreover, the amount of future damages warranted by the evidence and the law in a given case is a mathematical fact. There is no logical reason why it should not be established by proof like other relevant facts.

*Id.* at 1181. Even in those courts where offset damages have been recognized and thereafter discredited by later Supreme Court decisions, *see, e.g., Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980), the plaintiff must introduce *evidence* of the factors bearing on the present worth of future earning losses. *See Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. at 546, 103 S.Ct. at 2555 (1982). Indeed, in *Morgan v. Monessen Southwestern Ry,* 489 A.2d 254, 259; 339 Pa.Super. 465 (1985), *aff'd* 518 A.2d 1171, 513 Pa. 86 (1986), reversed on other grounds, *Mones-*

*sen Southwestern Ry Co. v. Morgan,* 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988), the Court stated:

> Although appellant submitted a requested instruction concerning reduction of a lost earnings award to present value, and now urges this court to reverse the judgment because the trial judge did not so charge the jury, appellant *presented no evidence* that would have supported such an instruction. If appellant wanted the trial court to instruct the jury regarding an alternative discount method, *evidence relevant to that method should have been offered.* (emphasis added.)

In the instant case, the *only* evidence with respect to present value was the mortality tables which established a 24½ year life expectancy for Gorniak.

Even the district court must have had doubts about applying a 15–year figure that was not in evidence because it made deliberate mention of the statement made by Gorniak's attorney in his summation, where the attorney stated that the plaintiff would be able to keep a light-duty job at age 65. I have reproduced that statement above as it appeared in the district court's opinion.

However, statements made in summation, as the district court itself was careful to acknowledge, are not evidence, nor can we substitute for evidence the inferences drawn in the majority opinion in order to support its affirming decision. In particular, I note that it is *only* the majority opinion which seeks to support the district court's decision by post-trial, after-the-fact inferences. Certainly the district court in its own opinion holding a 15–year term appropriate, never relied upon or drew the inferences now supplied for the first time in the majority opinion. And even those inferences, if drawn by the district court, and they were not, could, at the very least, have been countered by just as plausible contrary inferences.[2] Nor could the dis-

---

2. For example, absent evidence of a collective bargaining agreement or pension provisions for retirement at age 65, or testimony from Gorniak as to his own work intentions, it could be inferred that Gorniak would continue working to

or after age 70. The Age Discrimination in Employment Act (ADEA), at one time prohibited compulsory retirement of employees before the age of 70. Since October 1986, effective January 1, 1987 (some 22 months before the

trict court substitute for competent evidence "its own common sense" (see footnote, maj. op. page 487) in calculating the period to apply in the "present worth" formula.

Moreover, the district court based its calculation not on the inferences found in the majority opinion (maj. op. at 487–88), but rather on the following reasoning. It did so with no evidentiary foundation:

> The 15–year figure is based on a round estimate of plaintiff's retirement at age 65. This is a common retirement age familiar to most people.

I suggest that even though the difference in this case between the 24–year and the 15–year present value is not substantial, that we should not depart from such a fundamental, settled and established principle of jurisprudence—that the factfinder's determinations must be derived from evidence in the record—in order to sustain what is obviously an erroneous result. Present value is determined from the factors that are produced *in evidence* and the burden rests upon the plaintiff to produce them. In this case, Gorniak did not discharge his burden, and there are no factors to be found in evidence to support the majority's holdings. As stated, the only factor in evidence was the 24–year factor of the mortality tables.

Thus, rather than affirm the district court on this issue, I would reverse and remand to the district court with the direction that the district court enter a judgment in the amount calculated by application of a 24–year period or $27,582.72, representing the present value of the loss of future earnings. I therefore respectfully dissent.

district court's present worth calculation), the    ADEA extended the age ceiling *beyond* age 70.