1999 UT App 151

**Mark S. DALEBOUT, Plaintiff and Appellee,**

v.

**UNION PACIFIC RAILROAD COMPANY, Defendant and Appellant.**

**No. 981163–CA.**

Court of Appeals of Utah.

May 6, 1999.

Rehearing Denied June 14, 1999.

---

Morris O. Haggerty and Larry A. Gantenbein, Union Pacific Railroad Company, Salt Lake City, for Appellant.

Richard I. Ashton, Ashton, Braunberger & Boud, Sandy, and John J. Rossi, Kiker & Inderwish, PC, Aurora, Colorado, for Appellee.

Before GREENWOOD, Associate P.J., BILLINGS and JACKSON, JJ.

## OPINION

JACKSON, Judge:

¶ 1 Union Pacific Railroad Company (Union Pacific) challenges a jury verdict for Mark S. Dalebout. We reverse and remand in part and affirm in part.

## BACKGROUND

¶ 2 We recount the facts in a light most advantageous to the jury's verdict, mentioning contrary evidence only as it aids in understanding our resolution of this appeal. *See Patey v. Lainhart*, 366 Utah Adv. Rep. 21, 21, 977 P.2d 1193, 1195 (Utah 1999).

¶ 3 Dalebout brought this personal injury action against Union Pacific under the Federal Employers' Liability Act (FELA). *See* 45 U.S.C. §§ 51–60 (1983). He asserted that he was injured by Union Pacific's negligence and requested damages for past and future medical costs, past wage loss, future impairment of earning capacity, and past and future pain and suffering.

¶ 4 Dalebout was twenty-six when he started working for Union Pacific in 1975. He had graduated from high school and completed about two-and-a-half years of college. His prior work history included carpet sales, ski patrol, and ski lift operations. Over the years with Union Pacific, Dalebout worked as a switchman, then brakeman, conductor, and, finally, an engineer.

¶ 5 On February 1, 1993, while Dalebout was working as an engineer running a locomotive, the defective seat in which he sat dropped three or four inches as he tried to open a window. He was jarred and felt sharp pain in his back. Dalebout reported the injury to Union Pacific and took ten days off with pay before returning to work. His doctor diagnosed him with back strain, treating him with physical therapy and anti-inflammatories. Despite the treatment, Dalebout's back remained painful.

¶ 6 Dalebout then visited another doctor, Dr. Bryan. Based on a magnetic resonance image (MRI) and X-rays, Dr. Bryan determined that Dalebout had degenerative disc disease with minimal bulging of two spinal discs. The disc disease had pre-existed the injury, but apparently had not been painful. The injury had then exacerbated the disease, precipitating Dalebout's back pain. Dr. Bryan prescribed more anti-inflammatories. Meanwhile, Dalebout continued the physical therapy exercises on his own and kept doing them through the time of trial.

¶ 7 In further visits to Dr. Bryan, Dalebout described chronic pain in both his back and legs. He also reported that part of his right foot was numb. About three years after the first MRI, Dr. Bryan ordered another one, which showed little change. Dr. Bryan continued prescribing anti-inflammatories.

¶ 8 Via a videotaped deposition shown at trial, Dr. Bryan testified that Dalebout's pain was twenty percent related to his injury and eighty percent related to the pre-existing degenerative disc disease. Dr. Bryan stated that the disc disease would worsen over the years, but he could not predict whether Dalebout's pain would also worsen. Regarding future treatment, Dr. Bryan testified that Dalebout would always need anti-inflammatories and an occasional epidural steroid injection to cope with his lingering backache. He further opined that a thirty-percent chance exists that Dalebout may need back surgery. The doctor stated that Dalebout would not be able to work as an engineer if he underwent the surgery. Without the surgery, though, the doctor testified that there is no reason why Dalebout can not continue to work as an engineer.

¶ 9 Dalebout testified at trial that his back constantly hurts and his legs have become painful too. The pain seems to be slowly worsening, and he has to be careful in his activities to keep from further irritating his back. Indeed, Dalebout has had to greatly curtail his personal and recreational pursuits, including skiing. Lifting, twisting, standing or sitting for long periods, and even sneezing can aggravate his condition. He takes daily pain medication, increasing the dosage over time.

¶ 10 Before the injury, Dalebout had no physical limitations. Now, he may not lift more than fifty pounds. Although his job description requires him to be able to help lift eighty-three pounds, Dalebout testified that his lifting restriction has not hampered his work. In fact, Dalebout testified that his injury does not affect his ability to do his job because he works with his hands. Except for the first ten days, he has not even missed a day of work because of the injury. However, with his back pain, he is not always physically comfortable at work and must sometimes readjust his body position or stand up. Both Dalebout and his close friend who also works for Union Pacific testified that Dalebout worries about his livelihood. Still, since his injury, Dalebout has been able to work all shifts available to him and his

wages have increased. He testified that he plans to work until he is sixty-five.

¶ 11 Although Union Pacific has not asked Dalebout to be physically examined in recent years, Tim Holmes, a Union Pacific representative, testified that the railroad may physically examine any employee to determine if he is fit for duty. Holmes acknowledged that federal laws require Union Pacific to accommodate disabled employees. Holmes further testified that if Dalebout became unable to work Dalebout would lose $78,000 per year.

¶ 12 Before trial, the trial court denied Union Pacific's motion in limine asking the trial court to exclude Dr. Bryan's testimony that Dalebout has a thirty-percent chance of needing future back surgery. After Dalebout presented his witnesses at trial, Union Pacific unsuccessfully moved for a directed verdict, arguing Dalebout had introduced insufficient evidence to support his claims involving future surgery and future impairment of earning capacity. Union Pacific later objected to jury instructions letting the jury consider future surgery and future impairment of earning capacity. The jury found Union Pacific liable for negligence and returned a verdict for Dalebout, awarding $825 for past medical costs; $5,040 for future medical costs; nothing for past wage loss; $275,000 for future impairment of earning capacity; $12,500 for past pain, suffering, and loss of enjoyment of life; and $200,000 for future pain, suffering, and loss of enjoyment of life (future pain and suffering).

¶ 13 Union Pacific moved for a judgment notwithstanding the verdict (JNOV) under Utah Rule of Civil Procedure 50 or a new trial under Utah Rule of Civil Procedure 59, arguing that insufficient evidence supported the jury's verdict involving the issues of future surgery and future impairment of earning capacity. Alternatively, Union Pacific argued that the trial court should order a remittitur of damages awarded for future impairment of earning capacity. Union Pacific further contended that the evidence that

Dalebout has a thirty-percent chance of future surgery likely tainted the jury's award of damages for future pain and suffering and thus requested a new trial or remittitur on that basis too. The trial court denied all Union Pacific's motions for JNOV, new trial, and remittitur.

¶ 14 On appeal, Union Pacific does not challenge its liability for Dalebout's injury, instead attacking the damages awards for both future impairment of earning capacity and pain and suffering. Union Pacific's arguments flow from its contention that the trial court should not have admitted into evidence Dr. Bryan's testimony that Dalebout has a thirty-percent chance of future back surgery.

¶ 15 First, regarding future impairment of earning capacity, Union Pacific insists that, without Dr. Bryan's testimony on the thirty-percent chance, Dalebout presented insufficient evidence to support his claim. Union Pacific thus asserts the trial court should have granted its requests to direct a verdict or enter a JNOV for Union Pacific on future impairment of earning capacity. On the other hand, Union Pacific maintains that, even if other evidence supported an award here, there is a reasonable likelihood that the amount would have been lower absent Dr. Bryan's inadmissible testimony.

¶ 16 Second, regarding future pain and suffering, Union Pacific similarly argues that the award would have been different had Dr. Bryan's testimony on the thirty-percent chance been excised. Union Pacific thus protests the trial court's refusal to order a remittitur or new trial, without Dr. Bryan's inadmissible testimony, regarding damages for future pain and suffering.[1]

## ANALYSIS

### I. Overview of FELA

■ ¶ 17 Recognizing the hazards of railroading, Congress passed FELA in 1908 "to shift part of the 'human overhead' of doing business from employees to their employers."

---

1. We have reviewed the other issues raised by the parties and have determined they lack merit; we therefore decline to address them further other than to affirm the trial court. *See State v.*

*Carter,* 776 P.2d 886, 888 (Utah 1989) (stating we "need not analyze and address in writing each and every argument, issue, or claim raised and properly before us on appeal").

*Belt v. Burlington N.R.R. Co.*, No. A–96–305, 1997 Neb.App. LEXIS 110, at *15, 1997 WL 411197, at *6 (Neb.Ct.App.1997); *see also* 32B Am.Jur.2d *Federal Employers' Liability and Compensation Acts* § 2 (1996) ("[FELA] seeks to adjust the cost of injury equitably between employee and employer; to stimulate carriers to take measures for the prevention of injury to their employees; to provide a liberal rather than a static remedy for injured workers; to protect the health of employees; and to promote public interests."). However, FELA is not the same as worker's compensation—it does not cast railroad employers in the position of insuring their workers' safety. *See Belt*, 1997 Neb. App. LEXIS 110, at *16, 1997 WL 411197, at *6. Instead, a railroad's liability is based on negligence. *See id.* FELA exclusively controls a railroad employee's claim against a railroad employer for an on-duty injury caused by the railroad's negligence. *See id.; accord Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269, 1274 (3d Cir. 1995).

¶ 18 Two fundamentals of FELA law shape our treatment of this case. First, "FELA requires liberal construction in order to protect railroad employees." 13 *Personal Injury* § 1.01 (Louis R. Frumer & Melvin I. Friedman eds., 1998); *accord* 32B Am.Jur.2d, *supra*, § 3. Second, "FELA cases adjudicated in state court are subject to the forum state's procedural rules, while federal law governs the substantive issues." *Handy v. Union Pac. R.R. Co.*, 841 P.2d 1210, 1214 (Utah Ct.App.1992); *see also* 13 *Personal Injury, supra*, § 1.05[4] ("The FELA cause of action is a creation of the United States Congress, and the rights created by the Act are federal rights protected by federal law which does not vary according to the differ-

ing conceptions of state or local courts."). Specific to this case, " 'questions concerning the measure of damages in a FELA action are federal in character.' " *Reusch v. Seaboard Sys. R.R.*, 566 So.2d 489, 491 (Ala. 1990) (citation omitted); *accord* 11 Am.Jur. Trials *Federal Employers' Liability Act Litigation* § 2 (1966). Indeed, "[m]ore consistent results have thus been achieved in FELA actions than is possible in the case of other torts where each state is free to follow its own damages rules." 11 Am.Jur. Trials, *supra*, § 34.

## II. Admissibility of Testimony about Future Surgery

¶ 19 Union Pacific first contends the trial court should not have admitted into evidence Dr. Bryan's testimony that Dalebout has a thirty-percent chance of needing future back surgery. It argues that the thirty-percent figure merely shows a possibility of future surgery, whereas the law requires a showing that the future surgery is probable.

¶ 20 Ordinarily, we greatly defer to a trial court's ruling on the admissibility of evidence. *See State v. Pena*, 869 P.2d 932, 938 (Utah 1994). However, when the court's "selection, interpretation, and application" of a specific evidentiary standard is at issue, we review its determination for correctness. *See Stevenett v. Wal–Mart Stores*, 365 Utah Adv. Rep. 10, 11, 977 P.2d 508, 510–12 (Utah Ct.App.1999) (citing *Utah Dep't of Transp. v. 6200 S. Assocs.*, 872 P.2d 462, 465 (Utah Ct.App.1994)).

¶ 21 A FELA plaintiff may recover "damages for such results of the defendant's wrong as the plaintiff *will probably suffer* in the future." [2] *Moore v. Denver & Rio*

---

**2.** Instead of probability, some jurisdictions speak of the "reasonable certainty of future damages." *See, e.g., Trejo v. Denver & Rio Grande W.R.R. Co.*, 568 F.2d 181, 184 (10th Cir.1977); *Harp v. Illinois Cent. Gulf R.R. Co.*, 55 Ill.App.3d 822, 12 Ill.Dec. 915, 370 N.E.2d 826, 829 (1977); *Foltz v. Burlington N.R.R. Co.*, 689 S.W.2d 710, 716 (Mo.Ct.App.1985). About this discrepancy in terms, one commentator has noted:

The clarity of the reasonable certainty standard ... has been confounded by a confusing clutter of labels, such as "in all likelihood," "reasonably probable," "medically probable," "proba-

ble," "more probable than not," "a probability," "more likely than not," "greater than fifty percent," "reasonable medical certainty," or any combination of the above. These labels are used in an apparent attempt to shed light upon the degree of proof required of the burdened party. The net effect of this profusion of language is to leave one wondering whether the courts are discussing the same standard or standards of subtly different degrees.

David P.C. Ashton, Comment, *Decreasing the Risks Inherent in Claims for Increased Risk of Future Disease*, 43 U. Miami L.Rev. 1081, 1103–

*Grande W.R.R. Co.*, 4 Utah 2d 255, 258, 292 P.2d 849, 851 (1956); *accord Kirchgestner v. Denver & Rio Grande W.R.R. Co.*, 118 Utah 20, 34–35, 218 P.2d 685, 693 (1950). Likewise, testimony regarding the likelihood of future medical treatment resulting from a railroad employer's negligence must show "a probability rather than a possibility." *Dallas v. Burlington N., Inc.*, 212 Mont. 514, 689 P.2d 273, 277 (1984). If the testimony shows a mere possibility, it is inadmissible. *See Harp v. Illinois Cent. Gulf R.R. Co.*, 55 Ill.App.3d 822, 12 Ill.Dec. 915, 370 N.E.2d 826, 829–30 (1977); *see also* Phillip E. Hassman, Annotation, *Admissibility of Expert Medical Testimony as to Future Consequences of Injury as Affected by Expression in Terms of Probability or Possibility*, 75 A.L.R.3d § 2[a] (1977) ("The majority of jurisdictions ... will admit only that testimony concerning future consequences which, in the opinion of the expert, will 'probably occur' or for which there exists a 'reasonable probability' of occurrence."). "This standard is best understood as requiring the victim to introduce evidence to demonstrate that the future event will more likely than not occur—that is, there is a greater than fifty percent chance of occurrence." David P.C. Ashton, Comment, *Decreasing the Risks Inherent in Claims for Increased Risk of Future Disease*, 43 U. Miami L.Rev. 1081, 1103 (1989); *see also Dallas*, 689 P.2d at 277 (stating medical testimony regarding future medical treatment must be "based upon an opinion that it is 'more likely than not' "); *Webster's New Universal Unabridged Dictionary* 1433 (1983) (defining "probable" as "that which is likely to be so, or more likely to occur than not to occur").

██ ¶ 22 Here, Dr. Bryan's trial testimony had been taken by videotaped deposition. The actual testimony was thus before the trial court when it considered Union Pacific's pretrial motion to exclude the testimony. In pertinent part, the exchange between Daleb-

out's attorney and Dr. Bryan follows: Counsel asked, "[Y]ou feel that there is a 30 percent likelihood that he will require back surgery; is that correct?" Dr. Bryan answered, "I put down a figure of around 30." Counsel then asked, "And whether or not if this surgery goes about, that he will be able to continue working as an engineer is unknown?" Dr. Bryan replied, "I don't believe if he comes to the point of requiring an operation that he will go back working as an engineer." Obviously, thirty percent is below fifty percent. Dr. Bryan's testimony raised only a possibility—not a probability—of future surgery. Consequently, the trial court incorrectly admitted into evidence this portion of Dr. Bryan's testimony.

¶ 23 Of course, "[e]rror may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected." Utah R. Evid. 103(a). However, we agree with Union Pacific's assertion that a reasonable likelihood exists that this testimony contributed to the jury's decision to award substantial damages for both future impairment of earning capacity and pain and suffering. "The erroneous admission of such testimony is reversible error, as it is impossible to determine to what extent the jury relied upon the testimony in its assessment of the damages." *Harp*, 12 Ill.Dec. 915, 370 N.E.2d at 829–30. Under our analysis, a new trial without Dr. Bryan's testimony regarding the thirty-percent chance of future surgery is warranted to reconsider damages for future pain and suffering and for impairment of earning capacity. However, before remanding on the issue of future-earning-capacity damages, we must address Union Pacific's final contention.

### III. Future Impairment of Earning Capacity

¶ 24 Union Pacific charges that, without Dr. Bryan's testimony on the thirty-percent chance of future surgery, coupled with his

04 (1989) (footnotes omitted); *see also* Phillip E. Hassman, Annotation, *Admissibility of Expert Medical Testimony as to Future Consequences of Injury as Affected by Expression in Terms of Probability or Possibility*, 75 A.L.R.3d § 2[a] (1977) ("[T]here is considerable confusion among the cases as to the meaning of 'reasonable certainty,'

'probability,' 'speculation,' and 'conjecture'....").

We discuss this case using the term "probable" just as the Utah Supreme Court has when discussing future damages in the two FELA cases we cite in the above text.

statement that Dalebout could not continue working as an engineer after such surgery, insufficient evidence exists to support Dalebout's claim of impaired future earning capacity. Union Pacific thus asserts that we should not include this issue in our remand for a new trial, but should simply reverse the jury verdict and award nothing regarding this aspect of damages.

¶ 25 Union Pacific challenged in vain the sufficiency of the evidence before the trial court in motions for directed verdict and JNOV. The trial court would have been justified in granting Union Pacific's motion for a directed verdict solely if, when viewing the evidence in a light most beneficial to Dalebout, no competent evidence existed to sustain a verdict for Dalebout. *See Merino v. Albertsons, Inc.*, 363 Utah Adv. Rep. 8, 8, 975 P.2d 467, 467–69 (Utah 1999); *see also Central of Georgia R.R. Co. v. Mock*, 231 Ga. App. 586, 499 S.E.2d 673, 675 (1998) (" 'In a FELA case, a directed verdict is possible only when there is a *complete absence* of probative facts supporting the nonmovant's position.' " (Citation omitted.)). Similarly, the trial court would have been justified in granting Union Pacific's motion for JNOV only if, examining all the evidence in a light favoring Dalebout, the evidence was insufficient to uphold the verdict. *See Hall v. Wal-Mart Stores, Inc.*, 959 P.2d 109, 111 (Utah 1998). However, as we will explore further below, "[i]t is a rare [FELA] case in which a defense motion for a directed verdict or a [JNOV] is successful either initially at the trial or ultimately on appeal." 11 Am.Jur. Trials *Federal Employers' Liability Act Litigation* § 2 (1966).

¶ 26 It is well settled that a FELA plaintiff may claim compensatory damages for impaired earning capacity. *See Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269, 1284 (3d Cir.1995). "Earning capacity means the potential for earning money in the future...." *Belt v. Burlington N.R.R. Co.*, No. A–96–305, 1997 Neb.App. LEXIS 110, at *29, 1997 WL 411197, at *11 (Neb.Ct.App.1997); *see Corbett v. Seamons*, 904 P.2d 229, 232 n. 2 (Utah Ct.App.1995). To recover, "a plaintiff must show that his injury has caused a diminution in his ability to earn a living. Such a diminution includes a decreased ability to weather adverse economic circumstances, such as a discharge or lay-off, or to voluntarily leave the defendant employer for other employment." *Gorniak v. National R.R. Passenger Corp.*, 889 F.2d 481, 484 (3d Cir.1989); *see Donovan v. Port Auth. Trans–Hudson Corp.*, 309 N.J.Super. 340, 707 A.2d 171, 175 (Ct.App.Div.1998).

¶ 27 Union Pacific argues that this showing by the plaintiff must be detailed and explicit, citing two FELA cases similar to this one: *Fashauer*, 57 F.3d at 1269, and *DeChico v. Metro–North Commuter R.R.*, 758 F.2d 856 (2d Cir.1985). It is true that if we used *Fashauer* and *DeChico* as our guiding legal authority, we would likely overturn the jury verdict here and decline to award any damages for future impairment of earning capacity. However, the policy underpinnings of FELA and other FELA cases we have reviewed persuade us to avoid such a harsh result and give Dalebout at least the chance to retry his future-earning-capacity damages without Dr. Bryan's inadmissible testimony.

¶ 28 One of FELA's aims was to ensure that juries would determine a higher percentage of cases than the proportion of those decided by juries at common law. *See* 13 *Personal Injury* § 2.02[5] (Louis R. Frumer & Melvin I. Friedman eds., 1998); *see also* 11 Am.Jur. Trials, *supra*, § 187 (stating Supreme Court has strongly emphasized "integrity of the jury system in FELA cases"). "In other words, the legislation was remedial and trial by jury was part of the remedy. Accordingly, the jury's power to draw inferences under FELA is significantly broader than at common law." 13 *Personal Injury*, *supra*, § 2.02[5]; *accord Belt*, 1997 Neb.App. LEXIS 110, at *24, 1997 WL 411197, at *13; *see also* 11 Am.Jur. Trials, *supra*, § 135 ("There is much room, perhaps more in FELA cases than in most litigation, for the use of circumstantial evidence and for the jury to draw inferences of negligence and of the other elements of the claim from the facts in evidence. It does not matter that possible inferences may be conflicting. It is the very essence of the jury's function to select from among conflicting inferences and conclusions those that it considers most rea-

sonable."). Thus, "although there are [FELA] cases that may be resolved as a matter of law, such cases are very few." 11 Am.Jur. Trials, *supra*, § 188. Our function as an appellate court " 'is exhausted when the evidentiary basis becomes .apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.' " *CSX Transp. Inc. v. Maynard,* 667 So.2d 642, 644 (Ala. 1995) (quoting *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946)).

¶ 29 In light of these principles, some jurisdictions require no more than proof that the plaintiff has a permanent injury somehow causing work difficulties to send to the jury the question of damages for impairment of future earning capacity. *See, e.g., id.* at 647 (" 'A complaint alleging permanent injury is sufficient to imply impairment of earning capacity.' " (Citation omitted.)); *Honeycutt v. Wabash R.R. Co.,* 313 S.W.2d 214, 218 (Mo. Ct.App.1958) ("[P]roof that plaintiff suffered a permanent injury is sufficient evidence for a recovery for loss of future earnings ... [so long as there is] a causal relationship between the permanent injury and the impairment of ability to work."). Certainly, in this case, at least that much evidence exists: Dr. Bryan testified that Dalebout will suffer from back pain and need treatment for the rest of his life. Dalebout testified that, although he generally works with his hands, he is quite physically uncomfortable at work and his job description requires that he be able to help lift up to eighty-three pounds, which would be hard for him. The Union Pacific representative testified that the railroad could require Dalebout to submit to a physical examination at any time to ensure he is fit for duty, including the lifting criterion. From Dalebout and the Union Pacific representative's testimony, the jury could infer that Dalebout's permanent injury might impair his ability to work. However, we need not rely solely on that proof in determining sufficient evidence exists to send this issue back to the jury.

¶ 30 The· evidence showed that Dalebout did not finish college, has been working for the railroad for much of his adult life, and has very little work experience in other contexts. What little outside work experience he does have seems mostly related to skiing, an activity he has had to quit because of his back injury. The evidence further implied that Dalebout's railroad work could be somewhat physically rigorous. Dr. Bryan opined that Dalebout's disc disease and injury would only worsen in the future, while Dalebout testified that the associated pain has steadily risen over the years.

¶ 31 From this testimony, the jury could have made a variety of broad inferences—which we have noted a jury is free to do under FELA law. For instance, the testimony as to Dalebout's age, lifting restriction, and the variety of constraints on his activities and movements could have led the jury to believe that Dalebout lacks job security— particularly in view of Union Pacific's right to physically examine him and hold him to the physical demands of his job description. *See Sanford Bros. Boats, Inc. v. Vidrine,* 412 F.2d 958, 971 (5th Cir.1969). Moreover, nothing in the evidence guarantees that the engineer position or any feasible alternative will be open to Dalebout for the remainder of his work life. *See Moore v. Chesapeake & Ohio R.R. Co.,* 649. F.2d 1004, 1011–12 (4th Cir.1981). Because Dalebout had not finished college and had done fairly physical work during virtually his whole career, the jury could have determined "that available occupational alternatives for [Dalebout] were not numerous and that his injury had ... impaired his future earning potential" if he needed to look for other work. *Sanford Bros.,* 412 F.2d at 972. Further, based on Dalebout's testimony about his increasing pain and discomfort on the job, the jury could have inferred that Dalebout "would no longer be able to continue working as a[n engineer] or that he might choose to seek an easier and less painful job" paying him less. *Belt,* 1997 Neb.App. LEXIS 110, at *36, 1997 WL 411197, at *13; *see also Robison v. Atchison, Topeka & Santa Fe Ry. Co.,* 211 Cal.App.2d 280, 27 Cal.Rptr. 260, 264 (1962) ("In view of the plaintiff's age and the evidence as to the discomfort involved in the performance of his duties and as to ·his impaired agility, the trier of fact could properly

find that he was reasonably certain to suffer a loss of future earnings....").

¶ 32 Even so, Union Pacific counters that since the injury Dalebout has not missed work except for the first ten days, has not missed a paycheck, and has even had raises. Union Pacific reminds us that Dalebout has not hinted that he might leave the railroad for any reason. It is true at the time of trial Dalebout was still an engineer for Union Pacific, but this does not keep him from being dismissed or laid off in the future. *See Wiles v. New York, Chicago & St. Louis R.R. Co.*, 283 F.2d 328, 332 (3d Cir.1960). As the Third Circuit has noted,

> Because of his present employment [Dalebout] has not yet suffered economic loss but if he cannot obtain gainful employment elsewhere he is chained to his present job in a kind of economic servitude. We cannot think that it was the intention of Congress in enacting [FELA] to effect such a result.

*Id.; see also Gorniak*, 889 F.2d at 484 (stating even if injured plaintiff was assured of keeping his job permanently, plaintiff could still recover as he has no duty to stay with current railroad employer); *Moore*, 649 F.2d at 1012 (declaring plaintiff "was under no obligation to keep her current position ... for the rest of her life"); *Belt*, 1997 Neb.App. LEXIS 110, at *35–36, 1997 WL 411197, at *13 ("The likelihood that the injured worker's employment with the railroad will or will not continue should, as are all factual matters, be left for the jury to decide....").

¶ 33 Union Pacific's contentions are not entirely without merit, though:

> The fact that plaintiff remained employed in a higher paying position, whether under those circumstances plaintiff was likely to look elsewhere for employment, and whether there was any real likelihood that the employer would terminate plaintiff under the circumstances are simply factors for the jury to consider in determining whether such damages should be awarded.

*Donovan*, 707 A.2d at 175; *see also Illinois Cent. Gulf R.R. Co. v. Russell*, 551 So.2d 960, 964 (Ala.1989) ("The fact that [the plaintiff] has continued to work six or seven days a week for sixteen months is 'merely evidence

to be considered by the jury in determining whether or not his earning power had been impaired by the accident.'" (Citation omitted.)); *Robison*, 27 Cal.Rptr. at 263 (holding evidence sufficient despite fact "that the plaintiff was able to return to his work 75 days after the accident and that he worked steadily thereafter"); *Belt*, 1997 Neb.App. LEXIS 110, at *37, 1997 WL 411197, at *13 (stating that counsel may alert jury to claim's weaknesses—i.e., plaintiff's lack of plans to leave railroad and compete in job market with injury—but those facts do not automatically render evidence insufficient). Of course, we do not suggest that the evidence as a whole *necessarily* supports awarding Dalebout damages for future impairment of earning capacity. *See Gorniak*, 889 F.2d at 484. We merely conclude that Dalebout introduced adequate evidence to permit a reasonable fact finder to determine that his earning capacity could dwindle in the future. *See id.*

¶ 34 We reiterate: "Our decision here is controlled by the fact that this is a FELA case, and the strong preference in such a case is for the jury to determine all factual issues where the jury can reasonably draw the particular inference or conclusion submitted to it." *Foltz v. Burlington N.R.R. Co.*, 689 S.W.2d 710, 716 (Mo.Ct.App.1985). We elect to leave "the resolution of any uncertainty ... to a properly instructed jury." *Belt*, 1997 Neb.App. LEXIS 110, at *34, 1997 WL 411197, at *12; *accord Gorniak*, 889 F.2d at 484. Consequently, we hold that enough evidence exists regarding future impairment of earning capacity, even absent Dr. Bryan's testimony on the thirty-percent chance of future surgery, to remand this issue of damages to be retried.

## CONCLUSION

¶ 35 We conclude the trial court incorrectly admitted Dr. Bryan's testimony that Dalebout has a thirty-percent chance of needing surgery in the future. This was reversible error because there is a substantial likelihood the verdict awarding damages for future impairment of earning capacity and pain and suffering would have been different without

the inadmissible testimony. Further, aside from Dr. Bryan's inadmissible testimony, enough evidence exists to support a jury verdict awarding damages for future impairment of earning capacity. Accordingly, we affirm in part and reverse in part, remanding for a new trial—without Dr. Bryan's inadmissible testimony—on damages for both future impairment of earning capacity and pain and suffering.

¶ 36 WE CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge, and JUDITH M. BILLINGS, Judge.