

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-20-2004

# Colyer v. Consolidated Rail

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-3890

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Colyer v. Consolidated Rail" (2004). *2004 Decisions*. Paper 208.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/208

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 02-3890
_____

CARL R. COLYER, SR.,

Appellant,

v.

CONSOLIDATED RAIL CORPORATION,

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(Dist. Ct. No. 02-84J)
District Court Judge: Hon. D. Brooks Smith

Argued March 9, 2004

Before: SLOVITER, NYGAARD, Circuit Judges, and OBERDORFER,[*] District Judge.

(Opinion Filed: October 20, 2004)

_____

OPINION OF THE COURT
_____

_____

[*] The Honorable Louis F. Oberdorfer, Senior District Judge, United States District Court for the District of Columbia, sitting by designation.

Mary E. Dixon, Esq.
White & Williams
One Liberty Place
Suite 1800
Philadelphia, PA 19103
                    Counsel for Appellant

J. Lawson Johnston, Esq.
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222
                    Counsel for Appellee


OBERDORFER, District Judge:   Plaintiff-appellant Carl Colyer sued Consolidated Rail

Corporation[1] ("Conrail") under the Federal Employers' Liability Act ("FELA"), 45

U.S.C. §§ 51 et seq., for damages resulting from an accident he suffered while working

for Conrail in 1998.  A jury found Conrail negligent and awarded Colyer $20,000, which

the trial judge reduced to $4000 based on the jury's finding that Colyer was 80%

responsible for the accident.

On appeal, Colyer challenges the following district court decisions: (1) the denial

of his request for post-trial relief on the ground that the jury verdict on contributory

negligence was not supported by the evidence; (2) the denial of his request for a new trial

based on "newly discovered evidence," namely, his employer's finding him unfit to return

---

[1]       Some Conrail operations -- including those at the facility where Colyer
worked -- were taken over by Norfolk Southern Railway Company ("Norfolk Southern")
in 1999, after the injury but during Colyer's post-injury employment.

to work immediately after trial, despite testimony at trial that he would be able to return to his old position; and (3) the granting of defendant's motion for judgment as a matter of law as to damages for lost future earning capacity.

We affirm the district court's decisions on the first two issues. As to the third, appellant persuades us that the accident deprived him of physical capacities requisite to performing work he could perform before the accident. We therefore reverse and remand for retrial on the issue of damages for lost future earning capacity.

# I

## A. Facts and Factual Disputes at Trial

### *1.     The Plaintiff's Injury*

Colyer worked as a carman in the Conrail Locomotive Repair Shop in Hollidaysburg, Pennsylvania at the time of his injury. A carman's duties may include repair of train cars, masonry, and painting. Colyer had performed all these jobs at various times in the 24 years he was employed as a carman for the railroad.

On the afternoon of March 9, 1998, while using an acetylene torch to repair a damaged train car, Colyer sustained third-degree burns to a two-inch by three-inch area on the top of his left foot. Colyer was using the torch to "burn" areas of the car, that is, using the torch's heat to soften or melt metal parts of the rail car to remove or smooth them (rather than to weld things together). Burning is performed with use of a torch connected to two hoses, one for acetylene and one for oxygen.

3

There was conflicting testimony at trial as to how the accident occurred. Colyer testified (with the support of several eyewitnesses) that he was injured when some type of explosion released a fireball from a hole on the side of one of the hoses attached to his torch. Conrail's witnesses testified that Colyer's injury most likely occurred when a piece of hot metal or "slag" from the burning procedure fell into or onto Colyer's boot.

There was also conflicting evidence as to the extent to which the railroad's negligence, or Colyer's, caused or contributed to the accident, regardless of how it occurred. Colyer introduced expert and lay testimony that Conrail did not properly maintain, inspect, or store the hoses in its shop, and that the hoses were often in poor condition. A section of the hose that Colyer had been using the day of the accident was introduced at trial. There was at least one hole visible in that section. Witnesses for both parties agreed that it would not be safe to use the section of hose in the condition it was in when introduced at trial. However, no one was able to say where that section had been located on the hose (near or far from where Colyer had been working), nor whether any hole (or holes) existed at the time of the accident.

Before using the torch the day of the accident, Colyer inspected the four- to six-foot area of the hose closest to where he was working and saw no particular problems. The parties agreed that it was Colyer's duty, confirmed by the Conrail Safety Rules, to inspect his equipment. There was conflicting testimony, however, as to whether Colyer's inspection satisfied company and industry standards or whether he should have inspected

4

the entirety of the hose.

The parties also introduced conflicting testimony as to whether Colyer's injuries could have been avoided (or minimized) if he had worn spats over his boots to provide additional protection, and whose fault it was that Colyer was not wearing spats at the time of the accident. Spats were not part of the safety gear Conrail required, but the company generally had them available for carmen who wished to wear them. Colyer testified that he had requested spats on the day of the accident, but Conrail had none available that day. Conrail pointed to evidence (from one of Colyer's experts) that, as a general rule, Colyer did not wear spats because he saw them as a tripping hazard.

### 2. Medical Treatment and Diagnosis

Three weeks after the accident, on March 31, 1998, Dr. Louton, a plastic surgeon, performed a full thickness skin graft to reconstruct the skin that had been destroyed by the third-degree burns. The surgery was successful. After a several-month recovery period, Colyer was released to work without restrictions; he returned to work as a carman on or about June 16, 1998.[2]

Approximately one year later, in June and July of 1999, Colyer consulted Dr. Opida, a neurologist, about lessened sensations and occasional intermittent pain on the outside of his injured foot. Dr. Opida testified that the symptoms reflected sensory nerve

---

[2] The parties stipulated that Colyer's lost wages from the time of the accident through his initial return to work in June 1998 totaled $6,864.00.

5

damage that was likely to be permanent, but that the motor nerves were not damaged. The neurologist testified that the sensory nerve damage appeared to be an after-effect of Colyer's burn, but acknowledged that this conclusion was based on the information he received from Colyer as to the onset of his symptoms. The neurologist prescribed some medication for Colyer but it did not resolve the problem or reduce the symptoms.

The following summer, in July of 2000, Colyer returned to Dr. Louton (the plastic surgeon who had performed the skin graft) complaining about irritation between the fourth and fifth toes of his left foot. At Dr. Louton's suggestion, Colyer consulted a podiatrist, Dr. Raymond, about this problem. Dr. Raymond diagnosed Colyer as having severe corns between those toes and as having hammer toes on toes two, three, four and five (all but the big toe) of both his feet. Dr. Raymond testified that the hammer toes were unrelated to the burn and appeared to pre-date the injury, but that the severe corns on the toes of his left foot "could be related to the work-related injury" if Colyer "was altering his gait and putting additional pressure on the outside of his foot to avoid pressure" on the locations where it was painful. AR128, 131. On cross-examination, Dr. Raymond conceded that he was "not sure" whether the problem with the fourth and fifth toes of Colyer's left foot was related to the burn. Dr. Raymond initially treated Colyer by trimming the corns every few months, but eventually decided surgery was needed to correct the hammer toes on the fourth and fifth toes of Colyer's left foot in light of the severe and recurring corns there. Dr. Raymond performed surgery on August 20, 2001.

6

Colyer also introduced the expert testimony of Dr. Wardell, an orthopedic surgeon who examined Colyer on September 21, 2001 (about a month after his surgery). Dr. Wardell testified that Colyer suffered permanent nerve damage as a result of the burn. He also testified that the burn had caused a "gait abnormality . . . due to the limited motion, limited excursion of [the extensor] tendons . . . . [B]ecause of the dysfunction due to the scarring of the tendons, he lacked the push-off because the tendons held the toes up." AR 278. According to Dr. Wardell, the "callus lesions over the fourth and fifth toes [were] secondary to the gait abnormality that was due to the burn." AR 279.

### 3. *Ability to Work / Loss of Future Earnings Capacity*

On December 6, 2001, Dr. Raymond cleared Colyer to return to work as of January 5, 2002. Although Dr. Raymond did not place any particular restrictions or limits on Colyer's ability to work, he testified that, as of Colyer's December 2001 physical examination, his injuries placed "physical limitations" on him in that "any activity that would require [him] to place his foot in a downward position such as going down a ladder, walking down an uneven surface, [or] kneeling in which his foot is placed in a backward position could create or would create discomfort." AR 135.

Dr. Wardell testified that Colyer had a "10 per cent permanent impairment of his left lower extremity." AR 282. He stated that "as a result of the injury and the type of surgery that [Colyer] had, even with a successful result, he would not be able to perform the job of a carman," AR 281, which, he explained, include "stand[ing] and walk[ing] for

7

prolonged periods of time, . . . squatt[ing], crawl[ing], kneel[ing], crouch[ing] and stoop[ing,] climb[ing] on irregular surfaces . . . or . . . vertical ladders or steps which are fairly steep." AR 274.

Cross-examination focused on the fact that Dr. Wardell had examined Colyer only once, and then approximately a month after his surgery. Dr. Wardell conceded that he would need a functional capacity assessment performed after Colyer attained maximum improvement after his foot surgery to know precisely what work restrictions Colyer would operate under. Nonetheless, Dr. Wardell maintained that, if Colyer returned to his old job, his painful calluses and lesions would recur. Although Dr. Wardell conceded that Colyer could physically perform a carman's job once he recovered from surgery, he said that Colyer "would have to put up with the onset of the painful calluses," which "will cause enough pain that he should not work [as a carman]." AR 296-97.

Colyer testified that "it's difficult" for him to do the work necessary for a carman's job, because that "necessitates climbing, crawling, bending over, kneeling down, [and] bending your foot in different positions." He testified that while he could likely do the work required by some carman positions (most likely as a mason, which Colyer seemed to believe was the type of carman position least likely to exacerbate his symptoms), there would be no assurance that he could keep any such position since more senior employees frequently "bump" those with less seniority down to less desirable and more taxing jobs. Other employees who testified confirmed the seniority "bumping" procedures. Colyer's

8

former supervisor testified that Colyer himself would be entitled to "bump" only one of the people holding a mason position, suggesting that he might not be able to keep that position. At the time of trial, Colyer had submitted the paperwork necessary to return to work and was scheduled for a company physical that was required before he could attempt to return to work.

Colyer also testified that he had made "inquiries" to find out about alternate employment while he was recovering from his surgery:

> A.   . . . I started sending my resume to different people and different places and the job center. As a matter of fact I was just out there last week at the job center, at the training center. I went there and applied for a job that Mr. Krause is going through to help teach, but it was a welding job, and I told them that I wouldn't be able to hold a welding job but I thought maybe it was some other type of job. But I have called numerous people and I sent out numerous resumes, and the City of Altoona is kind of tough right now. I have a degree in building construction technology from Williamsport Trade School, so I'm pretty good at carpentry and masonry work, but it's kind of hard to do. . . .
>
> Q.   The work you checked on that you can do, how much would it pay?
>
> A.   It seemed to me about the average job out there was about $8 an hour.
>
> Q.   Have you been able to get a job?
>
> A.   Not yet.

AR 346-47.

B.   Trial and Verdict

Trial began on January 15, 2002. At the close of Colyer's case in chief, Conrail moved for judgment as a matter of law. The district court denied the motion as to liability

9

but deferred ruling as to Colyer's claim for damages for loss of future earning capacity. At the close of evidence, on January 22, 2002, the court granted Conrail's motion as to the future earning capacity claim. The court held that "Colyer has provided some evidence that he has a permanent disability and cannot return to his job as a carman, but has not offered any evidence to show that he would have difficulty obtaining work with other employers, that he is only qualified for other jobs that are less lucrative than his former job with defendant or even that his injury limits his economic potential." AR 27. The district court therefore removed from the jury the question of damages for lost earning capacity, holding that Colyer had "not provided any evidence that could demonstrate that his injuries narrowed the range of economic opportunities available to him." Id. (internal quotation omitted).

Thereafter, the jury returned a verdict for Colyer in the amount of $20,000. The jury found that Conrail was 20% negligent and Colyer 80% negligent as to Colyer's injuries. The judge then molded the verdict to reflect the jury's contributory negligence, resulting in a verdict of $4,000.

C.    Post-Trial Attempt to Return to Work

One week later, on January 29, 2002, Colyer underwent a functional capacity evaluation that was required before he could return to work. The functional capacity report by ProCare Rehabilitation (the "ProCare report") identified "left foot pain" and "difficulty returning to work on a full time, unrestricted basis" as Colyer's "primary

10

problems" AR 57. It listed a "diagnosis" of "burn dorsal left foot; hammertoe 4th and 5th." The ProCare report stated that Colyer had attained a "physical demand category" of "light-medium." Id. It also stated that Colyer's "symptom magnification test rating" was "high" and that he had not given "maximum effort," noting that his "actual capacities may be higher vs. reported." Id. An Addendum to the ProCare report -- dated January 31, two days after the examination -- notes under "Past Medical History" that Colyer reported "bilateral shoulder soreness" and a "left rotator cuff tear" that would require surgery at some time that had not yet been scheduled.

The day after the functional capacity examination, January 30, 2002, Colyer's former supervisor, Bill Miller, called to tell Colyer that, based on the ProCare report, he had been found not fit to return to work.

### D. Post-Trial Motions

Colyer moved for post-trial relief in the alternate forms of either an amendment of the judgment or a new trial, in whole or only as to damages. He argued that the verdict was against the weight of the law and the evidence. He also argued that the trial court had erred in taking the question of damages for loss of future earnings away from the jury. Finally, he claimed he was entitled to relief because of newly discovered evidence, namely, his employer finding him unfit to return to work.

The district court denied Colyer's motion. In holding that the verdict was consistent with the law and the evidence, the court stated:

> There is ample evidence from which a jury may have concluded that the defendant was negligent in allowing hot slag to drop on his boot or in failing to wear spats. While plaintiff may believe that the award of damages was inadequate (and I must concede that I personally consider it quite low), a jury may have concluded that the plaintiff's damages as a result of the injury were temporal in nature and limited to the months immediately following his burn and his return to work without limitations.

AR 39. The court also reaffirmed its holding as to Colyer's future earnings claim.

Finally, the district court held that the "new evidence" did not justify a new trial. The court held that the fact that Colyer "has been declared unfit for work with the defendant" is "not 'newly discovered evidence' because the record already contained testimony from plaintiff and his physician that he was unable to return to his job as a carman." AR 41. The court reasoned that the "evidence probably would not have changed the outcome of the trial because the jury instructions still would not have included the damage elements of loss of future earning capacity and loss of future wages." Id. The judge acknowledged that he saw this evidence as going farther than the evidence at trial in that it showed Colyer could not "perform work above a medium level of exertion" and "demonstrates a narrowing of the plaintiff's economic horizons because he cannot perform heavy labor." Id. The court nonetheless declined to grant relief "because this is the type of evidence that could have been obtained prior to trial" and "counsel should have anticipated the need for evidence of this nature prior to trial." Id.

**II**

The district court had jurisdiction over this FELA action pursuant to 28 U.S.C.

12

§ 1331. We have jurisdiction over the appeal under 28 U.S.C. § 1291.

A.    Motion for New Trial: Verdict Against the Weight of the Evidence

Colyer moved for a new trial, in whole or as to damages only, on the grounds that the jury verdict was against the weight of the law and of the evidence. The district court denied that motion. Colyer challenges that decision, arguing that the evidence at trial established that Conrail's negligence was largely, if not entirely, responsible for his injuries. He claims that the jury's finding that he was 80% contributorily negligent was not supported by the evidence. He also argues that the $20,000 jury award was so inadequate as to constitute a miscarriage of justice, citing the district judge's statement that the award was "quite low."

We review for abuse of discretion the denial of a motion seeking a new trial on the ground that the verdict is not supported by the evidence. Grazier v. City of Philadelphia, 328 F.3d 120, 128 (3d Cir. 2003). "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991). The district court properly recognized that "[t]his is not one of those cases." AR 39.

The evidence at trial amply supports the jury's conclusion that Colyer's own negligence was largely responsible for his injuries. For example, Colyer conceded that he

13

was responsible for inspecting the hoses he used; the jury could have accepted the testimony that welders should examine the entire length of the hoses they were using and found Colyer's inspection negligent, limited as it was to only a few feet of each hose. Alternately, if the jury accepted the evidence that Colyer's injury was caused by dripping metal rather than a fireball from a defective hose, the jury could have found Colyer was negligent in allowing hot slag to land on his foot. Moreover, the jury could have found Colyer's failure to wear protective spats to be his own fault if it accepted the testimony that it was Colyer's practice not to wear spats rather than Colyer's testimony that Conrail did not have spats available that day.

Nor does the amount of the verdict "shock the conscience." The district judge's statement that he "personally consider[ed the award] quite low" is far from a finding that the award was, as a matter of law, inadequate in light of the evidence at trial. "[J]uries are afforded broad discretion and great leeway in fixing fair and reasonable compensation to an injured party; thus, [plaintiff] bears a heavy burden to demonstrate that the jury's award cannot stand." Waldorf v. Shuta, 142 F.3d 601, 621 (3d Cir. 1998). In light of Colyer's ability to return to work without limitations three months after the accident, and given the dispute as to the extent to which his later injuries were caused by the accident, the evidence did not compel a greater damages award.

The district court heard the testimony along with the jury and is in a better position than we are, after reviewing the cold record, to determine whether the evidence supported

14

the jury's verdict. We find that the district court acted well within its discretion in finding that the verdict was supported by the evidence.

B.     Motion for New Trial:  Newly Discovered Evidence

Colyer also sought a new trial on the basis of "newly-discovered evidence," namely, "Defendant declar[ing] Mr. Colyer unfit to return to work" despite its "refrain throughout trial that Mr. Colyer was able to return to work." He challenges the district court's denial of that motion.

Although Colyer refers to "Defendant's" finding him unfit for work, Colyer was employed by Norfolk Southern, not Conrail, when he tried to return to work after trial. It was Norfolk Southern, not Conrail, that sent him for a functional capacity evaluation and found him unfit to return to work based on that evaluation. See, e.g., AR 43-44.

The "standard for granting relief on the basis of newly discovered evidence" is "the same" whether relief is sought under Rule 60(b)(2) or pursuant to a motion for a new trial under Rule 59, as here. Compass Technology, Inc. v. Tseng Labs., Inc., 71 F.3d 1125, 1130 (3d Cir. 1995) (discussing relationship between Fed. R. Civ. P. 60(b)(2) and Fed. R. Civ. P. 59). Newly discovered evidence can justify a new trial "only if such evidence (1) is material and not merely cumulative, (2) could not have been discovered prior to trial through the exercise of reasonable diligence, and (3) would probably have changed the outcome of the trial." Bohus v. Beloff, 950 F.2d 919, 930 (3d Cir. 1991). The party seeking a new trial "bears a heavy burden" since relief "should be granted only

15

where extraordinary justifying circumstances are present." Id. We review the district court's denial of a new trial for abuse of discretion. Coregis Ins. Co. v. Baratta & Fenerty, Ltd., 264 F.3d 302, 309 (3d Cir. 2001).

"Newly discovered evidence [is] evidence of facts in existence at the time of trial of which the aggrieved party was excusably ignorant." Bohus, 950 F.2d at 930 (emphasis added). The "newly discovered evidence" here, according to Colyer, is his employer's decision that he was not fit to return to work. This, however, does not meet the definition of newly discovered evidence since Colyer does not allege that his employer had made this decision at the time of trial.[3] We have long recognized that "disqualification of [a] plaintiff for service . . . after the close of the case does not qualify as 'newly discovered evidence'" where the defendant "had not acted to disqualify [plaintiff] for service at the time of the trial." Brown v. Pennsylvania RR., 282 F.2d 522, 526-27 (3d Cir. 1960) (affirming denial of new trial where defendant found plaintiff "not medically qualified" to work one month after trial based on testimony of plaintiff's trial witnesses). As the Second Circuit explained in analogous circumstances, "[i]f it were ground for a new trial that facts occurring subsequent to the trial have shown that the expert witnesses made an inaccurate prophecy of the prospective disability of the plaintiff, the litigation would

---

[3]    We note that Colyer has not alleged that Norfolk Southern or Conrail knew or had reason to know, at the time of trial, what the results (or employment consequences) of Colyer's functional capacity evaluation would be. Nor has he alleged that either company acted in bad faith as to testimony introduced at trial or as to finding him unfit to return to work. This might be a very different case if he had.

16

never come to an end." Campbell v. American Foreign S.S. Corp., 116 F.2d 926, 928 (2d Cir. 1941) (affirming denial of new trial based on plaintiff's ability to work after trial).

Nor can the functional capacity evaluation -- which might be seen as evidence of facts that existed at the time of trial, namely, Colyer's physical condition -- be considered "newly discovered evidence" that could justify a new trial. There is no reason that Colyer could not have obtained equivalent evidence "prior to trial through the exercise of reasonable diligence." As the district court said, "this is the type of evidence that could have been obtained prior to trial," and which plaintiff's "counsel should have anticipated the need for . . . prior to trial." AR 41.

Under the circumstances, we cannot say that the district court abused its discretion in denying a new trial based on Norfolk Southern's finding Colyer unfit to return to work.

C.      Judgment as a Matter of Law: Damages for Lost Future Earning Capacity

A plaintiff in a FELA case may recover damages for the loss of future earning capacity if his injuries "have narrowed the range of economic opportunities available to him." Gorniak v. Nat'l R.R. Passenger Corp., 889 F.2d 481, 484 (3d Cir. 1989) (emphasis added). Conrail sought, and the district court granted, judgment as a matter of law on this issue. The district court held that Colyer had "not offered any evidence to show that he would have difficulty obtaining work with other employers, that he is only qualified for other jobs that are less lucrative than his former job with defendant or even that his injury limits his economic potential." AR 27. Colyer challenges that holding.

17

Our review of a decision granting judgment as a matter of law is plenary. LePage's Inc. v. 3M, 324 F.3d 141, 145 (3d Cir. 2003). A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). Judgment as a matter of law is appropriate only if "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001) (internal citation omitted).

To recover for the loss of future earning potential, a plaintiff need not "prove that in the near future he will earn less money than he would have but for his injury." Gorniak, 889 F.2d at 484. A plaintiff must show "that his injury has caused a diminution in his ability to earn a living," which may occur through a "decreased ability to weather adverse circumstances, such as a discharge or lay-off, or to voluntarily leave the defendant employer for other employment." Id. The necessarily speculative nature of this inquiry is not grounds for removing it from a jury. As we have explained,

> we cannot say that there [is] a significantly larger element of speculation in arriving at an estimate of [a plaintiff's] loss of future earnings than there would be in any ordinary instance requiring an estimate of damages by a jury. Since none of us is capable of foreseeing the future with any substantial degree of certainty every estimate of damages must contain elements of speculation.

Wiles v. New York, Chicago & St. Louis R.R. Co., 283 F.2d 328, 332 (3d Cir. 1960).

18

This Court has long "express[ed] a preference for leaving the resolution of any uncertainty about whether [] circumstances [affecting a plaintiff's future earnings] will come to pass to a properly instructed jury; a jury that may consider and weigh all the relevant factors and determine what price to place on a narrowing of a plaintiff's economic horizons." Gorniak, 889 F.2d at 484 (citing Wiles).

The evidence at trial as to limitations on Colyer's future earning capacity included: medical testimony that he had a permanent disability that limited his ability to perform various tasks (such as kneeling, squatting, walking on uneven surfaces, or going down a ladder); expert testimony that he could no longer work as a carman, based on an understanding that the job required the ability to squat, crawl, kneel, crouch, stoop, and climb on irregular surfaces and ladders; testimony that even if Colyer could perform some carman duties, there was no guarantee that he could return to a position requiring only such duties and, even if he obtained such a position, he might be "bumped" from it at any time; and Colyer's own testimony about "inquiries" he made about alternate employment outside the railroad, including his inability to do or difficulty doing jobs for which he was trained (such as welding, carpentry, and masonry) and his view, based on those inquiries, that the "average job out there" that he could perform paid "about $8 an hour." AR 346.

Viewing this evidence in the light most favorable to Colyer, and giving him the "advantage of every fair and reasonable inference," Lightning Lube, 4 F. 3d at 1166, we find that Colyer did submit "that minimum quantity of evidence from which a jury might

reasonably" conclude that his injuries had decreased the economic opportunities available to him. Trabal, 269 F.3d at 249. Given our longstanding preference for allowing the jury to "consider and weigh all the relevant factors and determine what price to place on a narrowing of a plaintiff's economic horizons," Gorniak, 889 F.2d at 484, we conclude that the district court erred in withdrawing this question from the jury. The evidence here is comparable to that found to require sending this issue to the jury, or to support a jury verdict, in prior cases.

The district court held that Colyer had submitted sufficient evidence for a jury to conclude that he has a permanent disability that would prevent him from working in his former position but not that he "would have difficulty obtaining an equally lucrative job with employers other than defendant." AR 26. However, this Court has never required a plaintiff to provide detailed evidence as to the likelihood of finding other jobs at a similar salary level. Past decisions instead reflect faith in the jury's ability to weigh various factors affecting a potential loss of future earning capacity when a plaintiff shows that his injuries have foreclosed some potential employment opportunities.

For example, this Court reversed a decision granting defendant a directed verdict as to the loss of future earning capacity despite the district court's holding that there was "no evidence regarding what, if any, positions [in plaintiff's field] were available to him[,] his prospect of attaining such a position[, or] what salary he would receive." Wilburn v. Maritrans GP, 139 F.3d 350, 361 (3d Cir. 1998) (emphasis added). Wilburn

20

introduced evidence that his accident at sea left him with permanent injuries that restricted his activities, although he could still perform his former job by compensating for those injuries. Id. at 363. He also introduced expert psychiatric testimony that the trauma of his accident at sea left him fearful of jobs that would require him to be out of sight of land (or "coastwise") in bad weather. Wilburn testified that he had withdrawn an application for a promotion when he was told he might be required to go coastwise and would not get the job if he remained unwilling to do so. We found this sufficient to allow a jury to find "a narrowing of Wilburn's economic opportunities" and "a sufficient basis upon which ... to compensate [him] for loss of future earning capacity." Id. We did not require plaintiff to demonstrate "what, if any, positions ... were available to him[,] his prospect of attaining such a position[, or] what salary he would receive." Id. at 361.

In Gorniak, we upheld an award of damages for lost earning capacity even though plaintiff was earning more than he had before his accident, and even though plaintiff conceded that, in light of his high seniority, there was only a "small" probability he would be bumped from his light-duty, high-paying position, and that, even if he were bumped, "most of the positions" to which he might be bumped were also light-duty positions that he could hold. Id. at 482-83. Nonetheless, expert testimony that plaintiff's physical restrictions "would preclude him from working" in certain positions in his union (including his previous position) "and in many positions in the [outside] industrial workforce," was enough for the jury to find plaintiff's "future earning capacity was

21

significantly diminished," despite the apparently uncontroverted fact that plaintiff was "fully able to obtain employment of a less strenuous nature." Id. at 483-84. We found it enough for Gorniak to show his "injuries hindered his ability to obtain other employment if he wished," and did not require evidence as to the types of job Gorniak was likely to obtain, the availability and prevalence of such jobs in the local economy, or the wages such jobs would pay. Id. at 484.[4]

In an earlier case, we reversed a district court decision setting aside jury-awarded damages for loss of future earning power as "too speculative [due to] the complete absence of evidentiary facts on which the jury could intelligently assess the monetary difference between" plaintiff's expected future earnings with or without his injury. Wiles v. New York, Chicago & St. Louis R.R., 283 F.2d 328, 332 (3d Cir. 1960). Wiles, too, was employed at the time of trial at a _higher_ salary than he was earning when injured. A medical expert testified that although Wiles' disability was minor and would not preclude his performing even heavy industrial tasks, he "would have difficulty in getting a job in heavy industry elsewhere than with the Railroad" because "substantial ... scars" on his back might make an employer leery. Id. at 331. We held that although Wiles had "not

---

[4]     Our only reference to such issues in Gorniak came in rejecting the employer's claim that Gorniak's "work as a security guard on the side" showed his work opportunities were not narrowed. Id. at 484 n.1. We cited Gorniak's testimony that his "hourly pay as a security guard was about half of that" at his regular job to refute the employer's claim, but made no suggestion that this represented what Gorniak could expect to make if he lost his position.

22

yet suffered economic loss," the chance that he might be "discharged or ... laid off" and be unable to find other employment showed that his "economic horizons have been limited by his injury." Id. at 332. Here, too, we found it sufficient that Wiles showed there were some jobs he might be unable to obtain (although he could perform them). We did not require any evidence as to the types of job that he could hold, the availability and prevalence of such jobs in the local economy, or the wages such jobs would pay. Far from it -- we reversed the district court's holding that the verdict was "too speculative" due to the "complete absence" of evidence as to the "monetary difference" the injury made to Wiles's future earnings.

Nonetheless, the district court here granted Conrail's motion for a directed verdict. Citing Gorniak, Wiles, and Wilburn, the court held that plaintiffs must satisfy two requirements in order to get to a jury as to this issue: "1) evidence of a permanent injury or deformity, and 2) evidence that the injury/deformity either forced plaintiff to take a job that paid less ... or ... evidence that the injury would make it much harder for plaintiff to find another job." AR 24. The district court found that Colyer had submitted sufficient evidence on the first of these two prongs but not the second. It held that plaintiff needed to "show that his disability would make it more difficult for him to find a job that pays as much as his former carman position with defendant," and had not done so. AR 25. The court identified only two ways to make this showing: through expert testimony, as in Wiles and Gorniak, or by testifying that he had "applied for other positions and [been]

23

told by the employers that he would never get the positions because of his disability," as in Wilburn. AR 25-26. The district court found that Colyer's evidence would support only a finding that he "cannot work in his former position, and the Third Circuit has never held that this is sufficient." AR 26.

The district court's view that the evidence could show at most that Colyer's injury prevented him from performing his specific prior job, as opposed to a variety of positions that required similar physical activities, is somewhat puzzling. First, Colyer's medical expert and treating physician both described physical limitations on his ability to perform various tasks -- such as squatting, crawling, kneeling, climbing -- that are necessary not only for the position of carman but also for numerous other physically demanding jobs. Second, Colyer himself testified not only about how his physical limitations affected his former job, but also that it was "kind of hard" for him to do "carpentry [or] masonry work" and that he couldn't do any "welding job" -- indeed, that he had withdrawn an application for a job when he found it required welding. AR 346. He also testified that, based on his "inquiries" about alternate employment, he thought other jobs that might be available to him paid only $8 -$9 per hour. Id. Although the district court dismissed this testimony as "vague," the jury was entitled to consider its specificity (and the defendant's ability or inability to refute it) in weighing it and determining whether to accept it.

Given our preference for allowing juries to address this decision, and the type of evidence that we have previously found to require sending this issue to the jury, we hold

24

that Colyer submitted sufficient evidence to send this issue to the jury. <u>None</u> of our cases have required a plaintiff to prove that the jobs that would be available to him would pay less than his prior position or than other jobs that he would be unable to perform due to his disability. In each case, we found evidence that a plaintiff was foreclosed from certain categories or types of jobs enough to show that his "economic prospects <u>have been narrowed</u>," <u>Wilburn</u>, 139 F.3d at 363 (emphasis supplied), and trusted the jury to assess the various factors and determine how to value that narrowing of prospects.

The district court cited acknowledged dicta in <u>Fashauer v. New Jersey Transit Rail Operations, Inc.</u>, 57 F.3d 1269 (3d Cir. 1995) to support his view that Colyer's evidence was insufficient. In <u>Fashauer</u>, this Court held a jury instruction as to loss of future earning capacity adequate, but noted that the plaintiff had submitted "no competen[t] evidence supporting [such a] claim." <u>Id.</u> at 1284. We pointed to the complete absence of any "testimony that [plaintiff] would have difficulty obtaining work with a different employer, or that jobs he could do after the injury were less lucrative than his railroad job." <u>Id.</u> at 1285. We also emphasized that "<u>no witness</u> even opined that Fashauer's injury limited his economic potential" and that "he essentially wanted the jury to take <u>his counsel's word</u> for it." <u>Id.</u> (emphasis added). This case is distinguishable from <u>Fashauer</u>. There was evidence here -- in the form of Colyer's own testimony -- that he would have difficulty finding other work, and that the jobs he would be likely to find are less lucrative. The expert medical testimony as to the physical limitations Colyer suffered are

25

consistent with his testimony. The district court analysis seems to suggest that Colyer could make the necessary showing only by presenting the precise evidence relied on in Gorniak, Wiles, or Wilburn, but there is no basis for such a restriction. Indeed, the Fashauer court explicitly rejected an "argument that evidence supporting lost earnings capacity must come from a vocational expert." 57 F.3d at 1284 (emphasis added).

### III

For the reasons explained above, we affirm the district court as to its denial of Colyer's request for a new trial based on newly discovered evidence and its denial of his claim that the jury verdict was against the weight of the evidence and the law. We reverse the district court's grant of Conrail's motion for judgment as a matter of law as to damages for lost future earning capacity and remand for a new trial on that issue.